214 N.J. Super. 408 (1986)
519 A.2d 911
TRIANTAFYLLOS THANASOULIS, PLAINTIFF-APPELLANT,
v.
WINSTON TOWER 200 ASSOCIATION, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted October 27, 1986.
Decided December 24, 1986.
*410 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and R.S. COHEN.
John Dolan Harrington, attorney for appellant.
Greenstone and Sokol, attorneys for respondent (Joseph B. Fiorenzo and Jeffrey A. Zenn, on the brief).
PER CURIAM.
Plaintiff, a nonresident owner of a unit in a condominium complex, challenges a rule adopted by the owners' association (Association) increasing the parking fee for tenants of nonresident owners from $25 to $75 a month, while leaving untouched the $25 fee charged to resident owners. Plaintiff attacks the rule as being unreasonable and unconstitutionally discriminatory. The parking facilities are part of the "common elements." The Association had the right to operate the parking facilities, to fix parking fees and to lease or rent the spaces. Plaintiff's *411 practice was to lease an indoor parking space for $25 a month for which he charged his tenant $75 per month. After the Association heard about this, it increased the parking fee for nonowners and required the tenants to execute parking space leases with the Association.
The trial judge found that the higher fee structure for tenants was discriminatory but not illegal. He concluded that the fee structure was not unconstitutional because there was no state action and the rule was not unreasonable inasmuch as it did not burden nonresident owners any more than resident owners. Summary judgment dismissing the complaint was entered accordingly. Plaintiff now appeals.
A condominium association stands in a fiduciary relationship to the unit owners. Siller v. Hartz Mountain Assoc., 93 N.J. 370, 382 (1983), cert. den. 464 U.S. 961, 104 S.Ct. 395, 78 L.Ed.2d 337 (1983); Papalexiou v. Tower West Condominium, 167 N.J. Super. 516, 527 (Ch.Div. 1979). A two-pronged test has been established to determine whether the Association breached its fiduciary duty: (1) whether its action was authorized by statute or its own bylaws, and, if so, (2) whether the action was fraudulent, self-dealing or unconscionable. Siller, supra, 93 N.J. at 382; Papalexiou, supra, 167 N.J. Super. at 527. The scope of judicial review is limited to these two questions, which are issues of law. Papalexiou, supra, 176 N.J. Super. at 527; see generally Note, Judicial Review of Condominium Rulemaking, 94 Harv.L.Rev. 647, 658-667 (1981). As long as the Association acted reasonably and in good faith the courts will not second guess its conduct. Papalexiou, supra, 167 N.J. Super. at 527.
It is undisputed that the parking fee schedule under attack was unanimously adopted by the Board of Directors of the Association and plaintiff does not attack its validity on procedural grounds. Hence the first prong of the Papalexious test has been met.
*412 As to the second prong of the test the judge concluded that the increased fee was reasonable and was adopted in good faith. He stated:
The defendant has established that the common property has to be supported by assessment against those, against all owners. So that the receipt of additional funds from non-owner [sic] runs to the benefit of all owners, meaning that they would then have to pay that much less by way of assessment. So that the act of discrimination by charging more is really for the benefit of all owners of the association, not a detriment to the owners, and that is the duty of the board of directors to exercise their best judgment in their actions to benefit all.
I don't see that Mr. Thanasoulis is in any way hurt by this. Because he does not charge for the parking space. The tenant makes a direct agreement with the association.
We reject plaintiff's contention that the fee change was unreasonable or made in bad faith because N.J.S.A. 46:8B-32 created a presumption of unconscionability as to the new leases between the Association and tenants. We read N.J.S.A. 46:8B-32 to be limited to leases made between the developer and owners' associations that are not controlled by the unit owners. See Siller v. Hartz Mountain Assoc., supra, 93 N.J. at 382 n. 10; Berman v. Gurwicz, 178 N.J. Super. 611, 620 (Ch.Div. 1981). Here the Association was completely controlled by the unit owners.
We now affirm the judgment dismissing the complaint substantially for the reasons expressed by Judge Huot in his oral decision of July 19, 1985. We are completely satisfied that all issues raised in this appeal are clearly without merit. R. 2:11-3(e)(1)(A) and (E). We add only that the record is barren of any proof which even remotely suggests that plaintiff suffered an economic loss by virtue of the rule change. Also, plaintiff failed to demonstrate a "sufficiently close nexus" between the State regulating condominiums by statutes and the parking rule implicated here so that it can be said that the parking rule change emanates from or is attributed to State action. State v. Schmid, 84 N.J. 535, 545 (1980), app.dism. sub nom. Princeton Univ. v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). The Condominium Act, N.J.S.A. *413 46:8B-1 et seq., did not command or compel passage of the new rule and there is no State actor involved in the administration of the new rule. See Callen v. Sherman's, Inc., 92 N.J. 114, 124-125 (1983). Hence the new parking rule is not unconstitutional and does not represent a breach of the Association's fiduciary duty to any of the unit owners.
Affirmed.
R.S. COHEN, J.A.D., dissenting.
Plaintiff Triantafyllos Thanasoulis owns a condominium apartment unit in Winston Towers, a highrise residential development in Cliffside Park. He rents the apartment to a tenant who lives there. Plaintiff brought this suit to challenge two condominium by-law amendments adopted by defendant owners' association. One imposes a monthly charge for parking spaces three times greater for tenant-occupants than for owner-occupants of the condominium units. The other prohibits rental of a condominium unit by a new purchaser until after he or she lives in the unit for at least one year, except in hardship cases. Plaintiff asserts that as a unit owner he has the right to a parking space on terms equal to those afforded to owner-occupants, and the right to rent the parking space to his tenant on terms he chooses. Plaintiff also asserts that, although the prohibition on rentals does not apply to him, but only to new purchasers, it improperly depreciates the value and marketability of his unit. The Chancery Division upheld the differential parking charges as a reasonable action of the Association, and held that plaintiff did not have standing to challenge a rental prohibition which expressly excepted him. I disagree on both scores.
A condominium unit owner holds exclusive title to the unit and shares title to the common elements with the other unit owners. The unit is an individual parcel of real property, which the owner may deal with "in the same manner as is otherwise permitted by law for any other parcel of real property." N.J. *414 S.A. 46:8B-4. Common elements may include the land on which the condominium project is built, parking areas, lobbies, hallways, elevators, and central services and utilities, not reserved to a particular unit or group of units. N.J.S.A. 46:8B-3d. Unit owners have the common right to use the common elements for their reasonable intended purposes. N.J.S.A. 46:8B-6. The proportionate undivided interest of a unit owner in the common elements is inseparable from the unit, and
any conveyance, lease, devise or other disposition or mortgage or other encumbrance of any unit shall extend to and include such proportionate undivided interest in the common elements.... [N.J.S.A. 46:8B-6]
Common element spaces may not be converted to the exclusive use of a single owner without unanimous consent of the other owners. Makeever v. Lyle, 125 Ariz. 384, 609 P.2d 1084 (Ariz. App. 1980).
There may be "limited common elements." They are
those common elements which are for the use of one or more specified units to the exclusion of other units. [N.J.S.A. 46:8B-3k]
Limited common elements are owned in common but are used exclusively. There is no individual ownership of limited common elements. It is only the use which is restricted. They may include yards, balconies, terraces, patios or stoops. See Wendell Smith, New Jersey Condominium Law (1985), Sec. 6:5b, p. 53-54. Parking spaces may be common elements or limited common elements. Juno By the Sea North Condominium v. Manfredonia, 397 So.2d 297 (Fla. Dist. Ct. App. 1981) pet. for rev. den. 402 So.2d 611 (Fla. 1981); Norris v. Edwin W. Peck, Inc., 381 So.2d 353 (Fla. Dist. Ct. App. 1980). Parking spaces may be sold as separate units, may be made available for assignment to unit owners by the developer or later by the association, or may not be individually assigned at all. Board of Managers of Surf East Condominium v. Cohn, 90 Misc.2d 1054, 396 N.Y.S.2d 999 (City Ct. 1977). Wayne S. Hyatt, Condominium and Home Owner Associations (1985), Sec. 7.41, p. 169.
A condominium is created by the recording of a master deed, N.J.S.A. 46:8B-8, in which, among other things, the units are *415 identified and the common elements and limited common elements are described, and by-laws are set forth to govern the administration and management of the property. N.J.S.A. 46:8B-3c; 46:8B-9. The deed must set forth, in percentages, the proportionate undivided interest of each unit in the common elements and limited common elements. N.J.S.A. 46:8B-3c. A master deed may be amended, but not to "change a unit" without the consent of its owners. N.J.S.A. 46:8B-11. The by-laws may also be amended. N.J.S.A. 46:8B-13.
The association of unit owners is responsible for the administration of a condominium. N.J.S.A. 46:8B-3b. It assesses and collects funds for the payment of "common expenses," N.J.S.A. 46:8B-14, which are the expenses for which the unit owners are proportionately liable, N.J.S.A. 46:8B-17, including the expenses of administration, maintenance, repair and replacement of the common elements. N.J.S.A. 46:8B-3e. The master deed or the by-laws may create a class of limited common expenses, for which some but less than all of the unit owners are liable. Smith, op. cit. supra, Sec. 6:2p. In the Winston Towers master deed, the terraces or balconies appurtenant to the units are designated as limited common elements. Expenses relating to them are made common element expenses, shared by all units, unless occasioned by the owner's negligence, misuse or neglect, in which the case the owner is responsible alone.
Winston Towers contains 614 apartment units. It includes a multilevel parking garage with 903 spaces and a parking yard with 100 spaces. They were all constructed by the developer and transferred to the condominium for management by the association. The cost of building the parking facilities was presumably included by the developer in the sales price of the individual units, just like the cost of the hallways and elevators. The master deed identifies the parking facilities as common elements and deals with them in the following language:
9. Parking and Garage facilities: The parking and garage facilities within the Property shall be part of the Common Elements and, subject to the provisions of the By-Laws, will be operated by the Association which shall have the right *416 to lease all or part of the operation thereof on such terms and conditions as it may determine. Each Unit Owner, upon application, will be entitled to rent annually at least one garage space. Rentals for garage space will be established by the Association and shall be payable as the Association shall direct. All revenue received by the Association from the garage operation shall be applied in accordance with the By-Laws.
The Amended Offering Plan contains consistent language.
Pursuant to its authority to rent garage spaces, the Association established a monthly rental schedule which applied to all units. $25 was charged for a single indoor space, $40 for a tandem space, and $20 for an outdoor space. In June 1981, the board of directors of the Association adopted the revised schedule of charges challenged in this suit. Owner-occupied units continued to pay the same amounts, but tenant-occupied units were now to be charged $75 for a single indoor space, $125 for a tandem space, and $50 for an outdoor space. Apartment rental leases were required to include provisions setting forth the new parking space rental rates and requiring payment by the tenant directly to the Association, with the unit owner remaining liable for non-payment.
The thinking that produced the new schedule of charges was expressed in a certification of the president of the Association:
In adopting these new regulations, the Board of Directors in no way sought to impose any greater burden upon those renting units at the condominium. Rather, the Board of Directors recognized that Unit Owners who were leasing their units and, in the process, subleasing their parking spaces, were charging tenants substantially more for parking space rent than the $25.00-per-month charge to the Unit Owner. As a result of the non-resident Unit Owner's attempt to commercially exploit the below-market parking rental fee charged by the Association, profits from the parking garage rentals were flowing to individual Unit Owners, instead of the Association, and its members, generally. The economic benefits of owning and operating the parking garage do not run to any individual Unit Owner, but rather to the Association for the good and welfare of all Unit Owners, as is clearly set forth in the Amended Offering Statement, Master Deed and By-Laws.
It is apparent that the Association treated the parking facilities as common elements which were owned by all the unit owners, which is perfectly true, and were therefore free of the interest of any individual owner, which is plainly untrue. The master deed grants to each unit owner the right to rent one *417 parking space. That is a right, appurtenant to unit ownership, to secure the temporary conversion of a part of a common element for exclusive use.
The purpose of the amendment to the by-laws was to prevent an owner from profiting by charging a tenant a garage rent greater than the below-market rate uniformly charged to unit owners. In determining that owner-lessors should not be allowed to charge tenants garage rents greater than the below-market rates, the Association improperly converted to the use of all unit owners a property right granted by the master deed to individual unit owners.
Condominium ownership is a form widely used in common law jurisdictions only recently. It combines the ceding of certain liberties by individuals with the assurance of freedom from some of the burdens of home ownership. As a seminal Florida case put it:
... inherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization. [Hidden Harbour Estates, Inc. v. Norman, 309 So.2d 180, 182 (Fla.App. 1975)]
The treatment of the rights of individual unit owners by the majority, represented by the owners' association, is a matter of only recent attention. During the years in which the condominium form of home ownership first spread, legislative and judicial concern understandably focused on the need for buyer protection from developers, and particularly from developers' efforts to burden the condominium community with long-term contracts favorable to the developers. See N.J.S.A. 46:8B-12.1, 12.2, 31-38; Note, Condominium Regulation: Beyond Disclosure, 123 U.Pa.L.Rev. 639 (1975). Now, concern must also focus on condominium community self-government and the challenge it presents to find an appropriate level of governmental involvement in this private but consequential relationship. *418 See generally Note, Judicial Review of Condominium Rulemaking, 94 Harv.L.Rev. 647 (1981).
The level of involvement should correspond to the broad range of power granted to condominium associations. N.J.S.A. 46:8B-14, 15; Wayne S. Hyatt, Condominium and Homeowner Association Practice: Community Association Law (1981), 177 ff. Associations have many characteristics of government, with similar capacity to affect the lives of community members. See Reichman, Residential Private Governments: An Introductory Survey, 43 U.Chi.L.Rev. 253 (1976). A troublesome matter is their ill-defined power to amend the by-laws in unexpected ways, and thus alter the structure of the community and the relations among its members.
The courts have not yet developed a consistent approach to the rule-making activities of condominium associations. State statutes do not ordinarily define the permissible subject matters or limit the substance of association rulemaking. See Note, 94 Harv.L.Rev. at 649.
A few courts have undertaken to review such rulemaking according to constitutional standards, on the model of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (judicial enforcement of restrictive covenants is state action). See White Egret Condominium, Inc. v. Franklin, 379 So.2d 346 (Fla. 1979); cf. Crowley v. Knapp, 94 Wis.2d 421, 437 n. 2, 288 N.W.2d 815, 823 n. 2 (1980). Contra, Owens v. Tiber Island Condominium Ass'n., 373 A.2d 890 (D.C. 1977). New Jersey has not adopted this approach. The actions of private entities like condominium associations are not state action without such a close nexus between state regulation and the challenged actions of the regulated entity that those actions can be said to emanate from or to be attributed to state government. State v. Schmid, 84 N.J. 535, 545 (1980), app. dism. sub nom. Princeton Univ. v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). See Callen v. Sherman's, Inc., 92 N.J. 114, 124 (1983) (statutorily authorized distraint procedures including permissible aid of state officers held to be state action).
*419 A larger number of courts have held association rulemaking, like administrative agency rulemaking, to the standard of "reasonableness," requiring, in various similar formulations, that an association (1) not exceed the scope of its authority, as defined by statute, the master deed and by-laws, and (2) not abuse its discretion by enacting arbitrary or capricious rules bearing no relation to the condominium's purpose of promoting the owners' health, happiness and enjoyment of life. The "reasonableness" rule was formulated in Hidden Harbour Estates, Inc. v. Norman, 309 So.2d 180, 182 (Fla. Dist. Ct. App. 1975), and Ryan v. Baptiste, 565 S.W.2d 196 (Mo. Ct. App. 1978). See also Johnson v. Hobson, 505 A.2d 1313 (D.C. 1986).
Other courts, including one in New Jersey, have looked to the corporation board of directors as a model for standards of association conduct, employing the "business judgment rule" to test the validity of association board actions. Papalexiou v. Tower West Condominium, 167 N.J. Super. 516 (Ch.Div. 1979); Rywalt v. Writer Corp., 34 Colo. App. 334, 526 P.2d 316 (1974).
Only once has the New Jersey Supreme Court dealt with condominium unit owner-association relations. Siller v. Hartz Mountain Assoc., 93 N.J. 370, cert. den. 464 U.S. 961, 104 S.Ct. 395, 78 L.Ed.2d 337 (1983). The context was a dispute with the developer over construction defects. The association was held to have sole standing to sue the developer over defects in the common elements, but each owner was the proper party to sue with respect to damages to the individual unit. If the association settled the common elements suit in a wrongful manner, the owners could maintain a suit against the association on that account.
In that context, the Supreme Court discussed the association's responsibilities to the owners:
The associations board of directors, trustees or other governing body have a fiduciary relationship to the unit owners, comparable to the obligation that a board of directors of a corporation owes to its stockholders. Acts of the governing body should be properly authorized. Fraud, self-dealing or unconscionable conduct at the very least should be subject to exposure and relief. See, e.g., Papalexiou v. Tower West Condominium, 167 N.J. Super. 516, 527 *420 (Ch.Div. 1979); Ryan v. Baptiste, 565 S.W.2d 196, 198 (Mo. Ct. App. 1978); Hidden Harbour Estates, Inc. v. Norman, 309 So.2d 180, 182 (Fla.D.Ct.App. 1975). [93 N.J. at 382-383].
Although the Supreme Court analogized an association's relationship to the owners to that of a corporate board of directors to the stockholders, its citation of Ryan and Hidden Harbour may mean that in an appropriate case the Court will adopt a more comprehensive rule of reasonability on the pattern of those cases.
At the very least, an association's amendment of by-laws must be procedurally correct (a concern not raised in this case) and reasonable in the Hidden Harbour sense. Reasonableness is not, however, the whole answer. A perfectly reasonable regulation may fail because it touches subject matter on which the association may not regulate. Juno By the Sea North Condominium v. Manfredonia, 397 So.2d 297 (Fla. Dist. Ct. App. 1981) pet. for rev.den. 402 So.2d 611 (Fla. 1981) (association may not require each unit to be cleaned by a service retained by it). An association may not take action to deprive unit owners of their interest in common elements. Stuewe v. Lauletta, 93 Ill. App.3d 1029, 49 Ill.Dec. 494, 418 N.E.2d 138 (1981); Makeever v. Lyle, 125 Ariz. 384, 609 P.2d 1084 (Ariz. App. 1980). In addition, a procedurally correct and substantively reasonable amendment should not create invidious classifications or unfairly diminish the rights of some unit owners for the benefit of others. Cf. Le Febvre v. Ostendorf, 87 Wis.2d 525, 275 N.W.2d 154 (Wis.App. 1979).
A purchaser of a Winston Towers apartment buys a bundle of property rights, including the exclusive use of the unit, access to the common elements, the exclusive use of certain limited common elements and the right to rent a parking space. The latter is the right to pay a fee to temporarily convert to exclusive use a portion of the common elements. See Juno By the Sea North Condominium v. Manfredonia, 397 So.2d 297, 301 (Fla. Dist. Ct. App. 1981) pet. for rev. den. 402 So.2d 611 (Fla. 1981). It is plain that the Association could not discriminatorily select a class of owners and terminate their rights to *421 parking facilities. Those rights are in the bundle granted in the master deed. The deed may be amended but not to "change a unit." N.J.S.A. 46:8B-11. Guaranteed access to parking facilities is of such consequence to a high-rise condominium apartment in a congested area that discriminatory termination of access guaranteed by the master deed would constitute a prohibited "change" of a unit.[1]
The master deed does not limit an owner's parking rights to personal use while a resident. The owner has rights "to rent annually at least one garage space." If an owner is permitted to lease the apartment to a tenant, there is nothing to justify barring an accompanying sublease of the appurtenant garage space. Indeed, it may well be unlawful to lease appurtenant parking rights separately from the unit. N.J.S.A. 46:8B-6.
If the owner's right to a garage space is an important and inseparable part of apartment ownership, and if the owner has the right to afford the use of the space to a tenant, what warrant is there for the Association's charging a tenant three times as much as an owner and requiring the owner to guarantee the tenant's payments? There is no assertion by the Association that tenant use of the garage creates higher costs.
The Association argues that the garage exists for the benefit of all owners and, if there is a profit to be made by renting spaces at market rates, it should belong to all owners. The argument ignores the fact that the right to rent a space is guaranteed to each owner just as is the right to exclusive use of the apartment unit itself. The owner's profit on renting the *422 apartment is not subject to confiscation by the Association, and neither is the owner's profit on subleasing garage use to the unit tenant. They are both profits gained by leasing the whole of the owner's bundle of rights to another person. It should not matter whether the apartment is leased for $1925 per month and the garage space for $75, or if the apartment costs $2000 per month and parking is afforded with no extra cost.
Paragraph 10 of the master deed suggests a parallel. It says:
Storage areas in the Building outside of the Apartment Unit shall be part of the Common Elements and the use thereof shall be allocated among the Unit Owners as the Association may from time to time prescribe.
Access to storage areas, like garage space, is one of the property rights that constitute unit ownership. It is a right granted by the master deed to be assigned exclusive use of part of a common element. No one would argue that the Association could deprive tenants of storage space or charge them a storage area fee not charged to owner-occupants on the thesis that such space is valuable and would cost tenants a lot to rent on the outside. The reason is that the right to allocation of a storage area is a right included in to unit ownership. It may not be converted to the benefit of all owners at the expense of the unit involved.
But, the Association would respond, we have the authority to set garage rents. That is so, but that is not the authority to act discriminatorily. It is not the right to require tenants to rent from the Association at a price three times the rate charged to owner-occupants. Such association power would confiscate from owners a property right which they bought and paid for as part of the unit purchase.
Some approaches to the issue of unfair by-law amendments refer to the owner's knowledge, at the time of purchase, that the rules could be changed thereafter. Others point to the contractual nature of condominium ownership and the owner's conscious decision to purchase and thus agree to subject individual rights to the will of the majority.
*423 The trouble with these approaches is that they assert too much. The buyer's awareness of the possibility of rule amendment cannot reasonably be seen as consent to any amendment, no matter how unfair. Cf. Montoya v. Barreras, 81 N.M. 749, 473 P.2d 363 (1970). Moreover, a contractual grant of authority to govern does not include consent to majority imposition of rules discriminatory and unfair to a minority. Every contracting party has the duty to act so as to effectuate the implicit covenant of good faith and fair dealing necessarily involved in the parties' contractual relationship. Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130 (1965); Einhorn v. Ceran Corp., 177 N.J. Super. 442, 449 (Ch.Div. 1980). The law should plainly impose upon condominium associations a duty to deal fairly, evenhandedly and in good faith with every unit owner.
The thesis that condominium buyers consent in advance to by-law amendments and knowingly contract for majority rule leads to a hands-off judicial posture. The idea developed early in the modern spread of condominium ownership when a few home buyers consciously chose to embrace the new curiosity. Those days have passed. Increasing numbers of housing buyers enter condominiums, not because they understand and prefer that form of community organization, but because affordable housing is often found in condominium townhouse developments. Perhaps 15,000 of the 55,000 housing units built in New Jersey in 1985 were condominium units.[2] It would be unrealistic for courts to give a wide berth to condominium self-government on the thesis of buyer awareness and consent. The fact is that most buyers purchase condominium units because they are affordable; they do not exercise choices of the *424 kind that should dilute their rights to fair, even-handed and good faith private government. See Note, 94 Harv.L.Rev. at 650-651, 653.
There may be some cases in which differences in judicial approaches to condominium self-government will lead to different results. This case is not one of them. Whether associations are treated as subject to constitutional review, as restricted to authorized and reasonable action taken for condominium purposes, or as bound by a fiduciary relationship with the owners, an association may not selectively create a class of individual owners and deprive them of valuable elements of unit ownership.
The other dispute between plaintiff and the Association is the validity of a new regulation barring rental of a unit by a new purchaser unless the purchaser first lives in the unit for at least a year, except in hardship cases. Since the new regulation would not bar plaintiff from renting his unit, the Chancery Division granted summary judgment on the thesis that plaintiff had no standing to challenge the regulation's validity.
The problem with that ruling is that there was no information before the court on the question how the new regulation affected plaintiff. The mere fact that it did not apply to him is no answer. If the regulation barred a new purchaser of plaintiff's unit from admitting persons to his unit more than five feet tall, it is quite certain that plaintiff would be immediately affected by the shrinkage of the sales market for the unit. The resulting loss of value would give him the "sufficient stake and real adverseness" necessary to confer standing. Crescent Pk. Tenants Assoc. v. Realty Eq. Corp. of N.Y., 58 N.J. 98, 107 (1971).
*425 It may seem likely that investors are a relatively small number of the people seeking to buy condominium units, and that a person buying a unit to live in will not be put off by a regulation of this kind. However, my impressions of what seems likely furnish a shaky foundation for rulings of law. Neither party offered any evidence on the motion to show whether or to what extent the regulation would affect the salability or value of plaintiff's unit. In those circumstances, I would treat the matter of impact on plaintiff's rights, and therefore the matter of standing, as an unresolved issue of material fact, thus ruling out a summary judgment on that matter.
The Chancery Division made the alternate ruling that, even if plaintiff had standing to challenge the regulation, it should be upheld because reasonable as to purchasers with notice. That is not a sufficient ground to reject plaintiff's claim, which is that a new restriction enacted long after he bought his unit restricts the alienability of his property. If it does, and if there is an effect on value significant enough to invoke judicial protection, plaintiff has standing to make a claim. The question of enforceability against new buyers with notice is not involved.
NOTES
[1] It requires no proof that a high-rise condominium apartment in a congested area with an available parking space is of greater value than the same apartment without guaranteed parking. It follows that such an apartment with parking for $25 per month is worth more than an apartment with parking for $75 per month. Thus, the rentability and obtainable rent for the apartment will also be affected by the cost of the parking facility. Those facts sufficiently answer any doubt that plaintiff is affected by the parking fee schedule and the requirement of garage rental by the tenant from the Association. The effect may not be major, but the rights invaded are basic.
[2] This is a rough estimate. It is based on reliable but not directly comparable figures. The Department of Community Affairs reports the issuance of 55,000 new building permits in New Jersey in 1985, with 17,500 or 32% in multi-family housing. It is likely that the great majority of the multi-family units were built for sale rather than rent, and that the bulk of the sales were in condominiums. The DCA also reports approval of condominium developments involving 11,000 units in 1984 and 18,000 in 1985. These include an uncounted but probably small number of conversions. According to the National Association of Realtors, 24% of the homes sold in the Northeast U.S. in the first nine months of 1985 were co-ops and condominiums. Sunday Star Ledger, January 26, 1986, Sec. 10, p. 73.