TRIANTAFYLLOS THANASOULIS, PLAINTIFF–APPELLANT, v. WINSTON TOWERS 200 ASSOCIATION, INC., DEFENDANT–RESPONDENT.

Argued February 17, 1988—Decided June 30, 1988.

*John Dolan Harrington* argued the cause for appellant.

*Joseph B. Fiorenzo* argued the cause for respondent (*Greenstone and Sokol,* attorneys; *Joseph B. Fiorenzo* and *Jeffrey A. Zenn,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

In this case we are required to reconcile the exercise of a condominium association's managerial powers with the provisions of the Condominium Act, *N.J.S.A.* 46:8B–1 to –38 (the "Act"), and a condominium master deed. Specifically, the primary issue is whether a condominium association can charge nonresident unit owners higher monthly parking fees than it charges resident owners in order to retain the extra revenue for the association's benefit. A second issue concerns an association regulation that prohibits a new purchaser of a condominium unit from renting the unit until after he or she has lived in the unit for one year. The trial court upheld both regulations and granted summary judgment in favor of the association. A divided Appellate Division panel affirmed, *Thanasoulis v. Winston Tower 200 Ass'n, Inc.,* 214 *N.J. Super.* 408, (1986). We hold that in adopting the parking fee differential, the association exceeded the scope of its power as defined by the Act and the master deed, and that the regulation is therefore invalid. We also find that because there remain unresolved issues of material fact concerning plaintiff's challenge to the one-year residency requirement, that question should not have been disposed of by summary judgment. We therefore reverse the judgment of the Appellate Division.

I

Plaintiff, Triantafyllos Thanasoulis, owns a condominium unit in the Winston Towers high-rise residential complex, located in Cliffside Park, New Jersey, which he presently leases to a tenant. The complex contains 614 apartment units and includes

a multi-level parking garage with 903 spaces and a parking yard with 100 spaces. Defendant, Winston Towers 200 Association, Inc. (Association), is the association of unit owners created by the Winston Towers Master Deed.

The Association, through its elected Board of Directors (Board), is responsible for the administration and management of the Winston Towers common elements, which include the parking areas. Paragraph nine of the master deed deals with the parking facilities:

> 9. PARKING AND GARAGE FACILITIES: The parking and garage facilities within the Property shall be *part of the Common Elements* and, subject to the provisions of the By-Laws, will be *operated by the Association* which shall have the right to lease all or part of the operation thereof on such terms and conditions as it may determine. *Each Unit Owner, upon application, will be entitled to rent annually at least one garage space.* Rentals for garage space will be established by the Association and shall be payable as the Association shall direct. All revenue received by the Association from the garage operation shall be applied in accordance with the By-Laws. [Emphasis added.]

Plaintiff purchased his unit in December 1972 and resided there until February 1981. During this period, plaintiff exercised his right to lease a parking space at the condominium's parking garage. The charges per month for parking spaces for all unit owners were $25 for a single indoor space, $40 for a tandem space, and $20 for an outdoor space.

In June 1981, the Board revised the parking charges. The rates for nonresident owners were increased to $75 for a single indoor space, $125 for a tandem space, and $50 for an outdoor space; the Association's rationale was that the new rates reflected the "market value" of parking spaces in the community. Resident unit owners would continue to pay the original rates. The president of the Association stated that through this action the Association sought to prevent unit owners who rented their units from realizing profits from parking space rentals. The Board determined that a unit owner would be prohibited from renting his unit unless his tenant separately leased the unit's parking space from the Association at the

higher rates.[1] The trial court noted that the additional funds raised by the revised rates were added to the common expense fund, which financed the maintenance of all the common elements.

In October 1981, the Association adopted another rule that required incoming unit owners to occupy their units for at least one year before leasing them to third parties.

In February 1983, plaintiff leased his unit, for the first time, to a tenant for a two-year term.[2] To conform with the Board's parking rule, plaintiff's agreement with his tenant contained the following language:

Landlord [plaintiff] agrees that he will guarantee payment of rent due and owing under said parking lease in the event Tenant fails to pay same promptly.

It is understood and agreed that the Tenant should enter into a lease with Management for Parking Space: $75.00 for indoor parking; $125.00 for tandem parking and $50.00 for outdoor parking per month and that any additional security required by management shall be paid by Tenant.

Plaintiff filed suit in the Chancery Division, seeking to invali-

---

[1]The minutes of the Board meeting at which the rule was adopted stated:
Rental application forms shall be amended to include the new rates. After August 1, no apartment lease will be approved by the Board, submitted for approval as provided by paragraph 18 of the Master Deed, unless the increased garage rental rate is specified in any such lease or rental arrangement. Such apartment leases shall specify that the garage rent security deposit and the garage rental itself be paid directly to the Association. All such apartment leasing arrangements shall additionally include a provision that the unit owner (the landlord) will be responsible to the Association for payment of the garage rent should the rentor fail to do so.

[2]The Appellate Division assumed that prior to the new rule "[p]laintiff's practice was to lease an indoor parking space for $25 a month for which he charged his tenant $75 per month." 214 *N.J.Super.* at 411. Plaintiff has never rented his parking space for $75, nor does the record reflect a desire on his part to do so. The reason plaintiff's lease with his tenant stipulates that the tenant will separately lease the parking space from the Association is that without such a provision the Association would not have allowed plaintiff to rent his unit.

date both rules.[3] The court granted defendant's motion for summary judgment. It found that although the differential parking charges discriminated against nonresident unit owners, such discrimination was not an illegal exercise of the Association's power. The court similarly disposed of plaintiff's challenge to the one-year residency requirement on the basis of a colloquy with counsel that apparently persuaded the trial court that plaintiff had been given notice of the residency requirement at the time he purchased his unit.

The Appellate Division's affirmance was "substantially for the reasons expressed by" the trial court. 214 *N.J.Super.* at 412. According to the majority, the scope of judicial review of condominium association decisions is limited to a two-pronged test: "(1) whether [an association's] action was authorized by statute or its own bylaws and, if so, (2) whether the action was fradulent, self-dealing or unconscionable." *Id.* at 411. The court assumed, without extended discussion, that the Association's action was properly authorized, and concluded that the first prong had been satisfied. In addition, the court accepted the trial court's finding that the parking rate differential "was reasonable and was adopted in good faith," and ruled that the Association's action was valid under the second prong of the test as well. The majority opinion did not address the one-year residency requirement issue.

The dissenting judge would have invalidated the revised parking fee schedule. Judge Cohen observed that the Association had "improperly converted to the use of all unit owners a property right granted by the master deed to individual unit owners." *Id.* at 471. After analyzing several sections of the

---

[3]Plaintiff's motion to have this action certified as a class action was denied, without prejudice, by the trial court. In his brief to this court, plaintiff "continues to reiterate his application" for class-action certification. As an appeal as of right by virtue of a dissent in the Appellate Division, *R.* 2:2–1(a)(2), the only issues before this Court are those that were the subject of the dissent. *Accord Brandenburg v. Brandenburg,* 83 *N.J.* 198 (1980). Judge Cohen did not address the class-action question, so the issue is not before us.

Act, Judge Cohen concluded that "an association may not selectively create a class of individual owners and deprive them of valuable elements of unit ownership." 214 *N.J. Super.* at 424. Concerning the residency requirement, Judge Cohen viewed the trial court's ruling on that issue as turning on the question of plaintiff's standing to challenge the rule. Judge Cohen expressed the view that plaintiff had been denied the opportunity to show that he had standing to challenge the residency requirement and that summary judgment in favor of defendant on that issue should not have been granted. *Id.* at 425.

By virtue of the dissent, plaintiff appealed as of right to this Court. *R.* 2:2-1(a).

## II

In *Siller v. Hartz Mountain Ass'n*, 93 *N.J.* 370 (1983), we noted some of the unique aspects of condominium ownership. We observed that "[t]he individual condominium purchaser owns his unit together with an undivided interest in common elements." *Id.* at 375. In addition, we explained that this ownership interest constitutes a separate parcel of real property that the owner may deal with as he would any parcel of real property. *Ibid.*

One aspect of condominium ownership that distinguishes it from other types of property interests, however, is the role of the condominium association. An association is comprised exclusively of the unit owners who, through their individual deeds, automatically become members. In essence, an association is responsible for the governance of the common areas and facilities used by the owners of the condominium units. It is a representative body that acts on behalf of the unit owners. Its powers derive from its by-laws, the master deed, and applicable statutory provisions. An association may enter into contracts, bring suit and be sued. The most significant responsibility of an association is the management and maintenance of the

common areas of the condominium complex. *See generally* W. Smith, *New Jersey Condominium Law* § 2:4, at 10–11 (1985) (generally defining and describing condominium associations); W.S. Hyatt, *Condominium and Homeowner Association Practice: Community Association Law,* 6–7 (1978) (same).

We have not had occasion previously to consider in depth the appropriate standard of judicial review of actions by condominium associations. In *Siller, supra,* 93 *N.J.* 370, however, we recognized certain basic principles: first, that acts of an association "should be properly authorized;" and second, that the association's management has a "fiduciary relationship to the unit owners, comparable to the obligation that a board of directors of a corporation owes its stockholders," and that "[f]raud, self-dealing or unconscionable conduct at the very least should be subject to exposure and relief." *Id.* at 382.

We need not elaborate on these principles here because, in our view, the validity of the parking fee regulation depends on whether its adoption was within the Association's authority as defined by the Act and the Winston Towers master deed. We agree with the dissent below that "[t]here may be some cases in which differences in judicial approaches to condominium self-government will lead to different results. This case is not one of them." 214 *N.J.Super.* at 424.[4]

Our discussion focuses on certain provisions of the Act and the Winston Towers master deed. A condominium is created by the recording of a master deed. *N.J.S.A.* 46:8B–8. The Act requires the master deed to contain certain information. *N.J.S. A.* 46:8B–9. Each unit of the condominium must be separately

---

[4]Our dissenting colleague is of a view that the principles we discussed in *Siller* are implicated in this case. *See post* at 664. However, the issue here is a condominium association's power to alter the property rights of unit owners guaranteed by the Act and the master deed. We do not reach the question of what the appropriate standard of review would be in a case involving an Association's exercise of its authority in a manner consistent with the Act and the master deed.

described and identified. *N.J.S.A.* 46:8B–9(e). The Act defines "unit" as "a part of the condominium property designed or intended for any type of independent use," including *"the proportionate undivided interest in the common elements * * * assigned thereto in the master deed * * *." N.J.S.A.* 46:8B–3o. (Emphasis added.) "Common Elements" means the land described in the master deed, and includes "yards, gardens, walkways, *parking areas* and driveways * * *, unless reserved or limited by the master deed." *N.J.S.A.* 46:8B–3d. (Emphasis added.) The Winston Towers master deed provides that the "common elements shall consist of all parts of the property other than the Apartment Units, including the items set forth in the Condominium Act," and specifies that the "parking and garage facilities within the Property shall be part of the Common Elements." The master deed also provides that each apartment owner is "entitled to rent annually from the Association at least one garage space."

Plaintiff's unit deed contained his unit designation as set forth in the master deed and a statement of his proportionate undivided interest in the common elements. A unit deed "shall have the same force and effect in regard to such unit as would be given to a like instrument pertaining to other real property * * *." *N.J.S.A.* 46:8B–10. Further, "each unit shall constitute a separate parcel of real property which may be dealt with by the owner thereof in the same manner as is otherwise permitted by law for any other parcel of real property." *N.J.S. A.* 46:8B–4; *see also Siller v. Hartz Mountain Ass'n, supra,* 93 *N.J.* at 375 ("unit owner, having a fee simple title, enjoys exclusive ownership of his individual apartment or unit, while retaining an undivided interest as a tenant in common in the common facilities * * *.").

■ The Act specifically characterizes the nature of plaintiff's property rights in his portion of the common elements:

The proportionate undivided interest in the common elements assigned to each unit *shall be inseparable from such unit, and any* conveyance, *lease,* devise or other disposition or mortgage or other encumbrance *of any unit shall*

*extend to and include such proportionate undivided interest in the common elements,* whether or not expressly referred to in the instrument effecting the same. The common elements shall remain undivided and shall not be the object of an action for partition or division. The right of any unit owner to the use of the common elements shall be a right in common with all other unit owners (except to the extent that the master deed provides for limited common elements) to use such common elements in accordance with the reasonable purposes for which they are intended without encroaching upon the lawful rights of the other unit owners. [*N.J.S.A.* 46:8B-6 (emphasis added).]

Thus, the Act explicitly guarantees that the right of a unit owner to the use of common elements is indivisible from the owner's interest in the condominium itself.

Each condominium unit owner is proportionately liable for "common expenses," which include "expenses declared common by provisions of [the Act] or by the master deed * * *." *N.J.S.A.* 46:8B-3e. These common expenses are charged to unit owners according to the percentage of their respective undivided interests in the common elements as determined by the master deed. *N.J.S.A.* 46:8B-17. Paragraph five of the Winston Towers master deed, in pertinent part, provides:

5. COMMON EXPENSES: Each Unit Owner shall be required to pay his proportionate share of the expenses of maintenance, repair, replacement, administration and operation of the Common Elements, including the fees, charges and expenses payable with respect to the Additional Recreational Facilities Agreement herein referred to which expenses are hereinafter referred to collectively as "Common Expenses". *Such proportionate share shall be the same as the proportionate, undivided interest of the Unit Owner in the Common Elements as set forth in Exhibit C hereof.* [Emphasis added.]

Thus, both the Act and the Winston Towers master deed mandate that the expense of common elements, such as the parking garage, be allocated proportionately among unit owners; neither authorizes a distinction in this regard between resident and nonresident owners.

A condominium association is responsible for the administration and management of the condominium. *N.J.S.A.* 46:8B-12. *N.J.S.A.* 46:8B-15 specifically enumerates some of the Association's powers, which are qualified by the master deed, by-laws, and other provisions of the Act. Chief among them for purposes of this case is the power of the Association to "lease or

license the use of common elements *in a manner not incon-sistent with the rights of unit owners.*" *N.J.S.A.* 46:8B–15(c) (emphasis added.)

Finally, the Act provides that a master deed may be amended or supplemented only "in the manner set forth therein." *N.J.S. A.* 46:8B–11. Further, no amendment to the master deed can "change a unit" unless that unit owner consents to the change. *Ibid.* Amendments to the Winston Tower master deed must be approved by "unit owners owning not less than Seventy–Five (75%) percent in the aggregate of the total ownership interest in the Common Elements."

### III

Because the Winston Towers master deed made the parking facilities part of the common elements, plaintiff's ownership interest in his unit included the exclusive use of his apartment unit, a proportionate undivided interest in the common elements, and the right to rent a parking space. *N.J.S.A.* 46:8B–6. This property interest is inseparable from the balance of plaintiff's unit, and his lease with his tenant "extended to and included" the parking space. *Ibid.* By substituting itself as the lessor of plaintiff's parking space and thereby severing plaintiff's property right to his parking space, defendant exceeded its authority under the Act, which permits it only to "lease or license the use of the common elements in a manner not inconsistent with the rights of unit owners." *N.J.S.A.* 46:8B–15(c).[5]

Defendant asserts that pursuant to the master deed the Association possesses broad discretionary control over the garage and the authority to change the parking-garage rentals. Concededly, defendant can establish reasonable rules and regu-

---

[5]The Association acknowledged plaintiff's ownership of the parking interest by making him responsible to the Association for payment of the garage rent should his tenant fail to pay. See *supra* at 654.

lations concerning the size of the spaces, speed limits in the garage, and other rules necessary to maintain order and safety in the area. But while it possesses the discretionary power to establish rental rates, the Association cannot expropriate the economic value of plaintiff's parking space for its own use. As a unit owner, plaintiff has the right to lease his unit, which includes his parking space and his interest in the common elements. The economic reality of the new regulation is that the Association has effectively confiscated for its own use the value of plaintiff's parking space.[6]

Moreover, the Association is prohibited by the Act from discriminating against plaintiff because he is a nonresident owner. Under the Act, plaintiff is only *proportionately liable* for his share of the common expenses, *N.J.S.A.* 46:8B–3e, determined on the basis of plaintiff's proportionate undivided interest in the common elements. *N.J.S.A.* 46:8B–9(g). Another vice of the parking fee regulation is that the higher fees paid by nonresident owners necessarily reduce the common-elements charge apportioned among all owners. In effect, defendant has required plaintiff, through his tenant, to contribute three times more money to the common-expense fund for parking privileges than do other unit owners who do not rent their units. The result is that plaintiff is compelled to bear a disproportionate share of the common expenses.

Defendant contends that a primary purpose of the new rule is to make less burdensome the common expenses shared by all unit owners. However, defendant's argument proves too much. Any reduction in the burden of common expenses resulting from the Board's action comes *at the expense* of one class of unit owners—those who rent their units.

---

[6]The Association notes that the market value of a parking space is $75. Therefore, unit owners who use their spaces, and pay the Association's $25 fee, realize an economic benefit of $50. Through the new rule, the Association expropriates this economic benefit from nonresident unit owners solely because they rent their units.

Defendant also contends that the parking garage exists for the benefit of all unit owners and any profit made by renting spaces should belong to all unit owners. This argument was persuasively refuted by Judge Cohen's dissent in the Appellate Division. He stated:

> The argument ignores the fact that the right to rent a space is guaranteed to each owner just as is the right to exclusive use of the apartment unit itself. The owner's profit on renting the apartment is not subject to confiscation by the Association, and neither is the owner's profit on subleasing garage use to the unit tenant. They are both profits gained by leasing the whole of the owner's bundle of rights to another person. It should not matter whether the apartment is leased for $1925 per month and the garage space for $75, or if the apartment costs $2000 per month and parking is afforded with no extra cost. [214 *N.J. Super.* at 421–22 (Cohen, J.A.D., dissenting).]

Obviously, the Association could not charge tenants of non-resident owners a surcharge for the use of some component of the unit, such as the right to use a unit's storage area, on the theory that the unit owner is deriving some profit from renting that part of his unit. Yet, because the Act and master deed accord plaintiff's parking space the same status as any other component of his property interest in the unit, that is precisely what the Association has done in this case.

The Association also seeks to justify its regulation as a security measure designed to prevent unit owners and their tenants from subletting their parking spaces to people not residing in the building. Security of the condominium complex is obviously a legitimate concern of the Association. In our view, however, the regulation at issue cannot be sustained on this basis. There are other methods by which the Association can secure the parking facilities, such as requiring permits and employing security personnel, without encroaching on the rights of unit owners under the Act and master deed.

The Association's action violates another provision of the Act. The revised schedule of parking space charges was adopted by the Association's Board of Directors. The Board's resolution, specifically referring to paragraph eighteen of the master deed, which established the procedure unit owners had to follow to

rent their units, declared that no leases of units would be approved without a provision requiring the owner's tenant to lease the parking space directly from the Association at the increased rental rates. The effect of the Board's action was to supersede paragraph eighteen of the master deed. Because the Board's resolution was adopted without the approval of seventy-five percent of the unit owners, it was an unauthorized exercise of power by the Board. *See N.J.S.A.* 46:8B–11.

Further, the Board's action in revising the parking rates constituted a "change in a unit" contrary to *N.J.S.A.* 46:8B–11, which prohibits "changes in a unit" without the consent of the unit owner. The Act does not define the phrase "change in a unit," but we assume that the legislative intent was that a unit owner should retain essentially the same property rights originally deeded to him for as long as he owns his unit, unless he affirmatively consents to their being altered. A parking space in a 614–unit condominium complex that is situated in a congested area is obviously a vital component of the unit. The revised parking rules have the effect of confiscating a portion of the property interest he acquired when he purchased his unit, thereby denying plaintiff the economic value of a portion of his unit. The revised rules, therefore, did constitute a "change" in plaintiff's unit in contravention of the Act.

Plaintiff purchased a property interest that included a proportionate undivided interest in the parking facilities, and the right to rent a parking space. That property interest was permanent and inseparable from his unit and could be altered only through the specific procedures contained in the Act and the master deed. Accordingly, defendant exceeded its authority, and the revised parking fee schedule is invalid.

█ Our reading of the trial court's disposition of plaintiff's challenge to the residency requirement reveals that the court did not properly focus on the essence of plaintiff's argument. The regulation was adopted nine years after plaintiff purchased his unit. The critical issue is not whether plaintiff or a new

purchaser received notice of the regulation prior to purchasing the unit. Rather, plaintiff argues that the regulation affects the marketability and value of his unit because it discourages prospective buyers who are interested in purchasing his unit for investment purposes. The record contains no evidence relating to whether the regulation affects plaintiff in this manner. We agree, therefore, with Judge Cohen that there remained unresolved issues of material fact concerning the threshold matter of plaintiff's standing to challenge this regulation. If plaintiff is able to establish that this regulation affects the alienability of his property to the extent that he has "sufficient stake and real adverseness" necessary to confer standing, *Crescent Park Tenants Ass'n v. Realty Equity Corp. of N.Y.*, 58 *N.J.* 98, 107 (1971), he may challenge its validity. Therefore, the grant of summary judgment in favor of defendant was improper.

The judgment of the Appellate Division is reversed and the matter is remanded to the Chancery Division for proceedings consistent with this opinion.

GARIBALDI, Justice, dissenting in part, concurring in part.

In *Siller v. Hartz Mountain Assocs.*, 93 *N.J.* 370, 382, *cert. den.*, 464 *U.S.* 961, 104 *S.Ct.* 395, 78 *L.Ed.*2d 337 (1983), we held that "[t]he association's board of directors, trustees or other governing body have a fiduciary relationship to the unit owners, comparable to the obligation that a board of directors of a corporation owes to its stockholders." *Accord Papalexiou v. Tower West Condominium*, 167 *N.J.Super.* 516 (Ch.Div.1979); *Rywalt v. Writer Corp.*, 34 *Colo.App.* 334, 526 *P.*2d 316 (Ct. App.1974). By analogizing the role of a condominium association to that of a corporation's Board of Directors, we concluded that the "business judgment" rule should be applied in reviewing condominium rulemaking.

Applying that rule in this case, I find that the Association acted within its authority and in good faith when promulgating

the regulation that increased parking garage fees for tenants of nonresident owners. Hence, I dissent from so much of the Court's judgment as holds that the parking garage regulation was invalid. However, I concur with so much of the Court's judgment as holds that summary judgment was improperly granted with respect to plaintiff's standing to challenge the one-year residency requirement.

I.

Ownership of a condominium differs in significant respects from other traditional forms of property ownership. Unlike the more traditional property owner, an owner of a condominium unit faces certain restrictions of ownership rights when entering into a condominium arrangement. In the condominium context, for instance, courts have consistently rejected individual unit owners' challenges to condominium rulemaking when the challenged restrictions have been promulgated by the Association in order to benefit a majority of the condominium's unit owners. *Papalexiou, supra,* 167 *N.J.Super.* 516 (right of Board of Directors to make special assessment against unit owners upheld); *Ritchey v. Villa Nueva Condominium Ass'n,* 81 *Cal.App.*3d 688, 146 *Cal.Rptr.* 695 (Ct.App.1978) (condominium by-laws restricting occupancy of unit to persons age eighteen or older upheld); *Rywalt v. Writer Corp., supra,* 526 *P.*2d 316 (Association authorized to construct tennis court on common property); *Johnson v. Hobson,* 505 *A.*2d 1313 (D.C.1986) (upheld regulation, under which unlicensed or unregistered cars could be towed from condominium lot); *Juno by the Sea N. Condominium Ass'n v. Manfredonia,* 397 *So.*2d 297 (Fla.Ct. App.1980) (parking regulation reasonable where prospective unit owners had notice of the assignment of parking spaces); *Seagate Condominium Ass'n v. Duffy,* 330 *So.*2d 484 (Fla.Dist. Ct.App.1976) (by-law amendment prohibiting leasing of units for any purpose other than a private dwelling for owner and immediate family upheld); *Hidden Harbour Estates, Inc. v. Norman,* 309 *So.*2d 180 (Fla.Dist.Ct.App.1975) (Board of Di-

rectors' rule prohibiting the use of alcohol in the condominium clubhouse upheld); *Franklin v. Spadafora,* 388 *Mass.* 764, 447 *N.E.*2d 1244 (1983) (by-law amendment limiting to two the number of units in condominium owned by any one person upheld); *Ryan v. Baptiste,* 565 *S.W.*2d 196 (Mo.Ct.App.1978) (Board of Directors rule installing locks on exterior entryways upheld); *Garrison Apts, Inc. v. Sabourin,* 113 *Misc.*2d 674, 678–80, 449 *N.Y.S.*2d 629, 633–34 (Civ.Ct.1982) (condominium regulation establishing security patrol and providing for patrol service in lieu of $25.00 per month assessment not discriminatory to tenants physically unable to serve where service not mandated but an alternative to payment); *River Terrace Condominium Ass'n v. Lewis,* 33 *Ohio App.*3d 52, 514 *N.E.*2d 732 (App.1986) (association's rule that all units had to be sprayed to exterminate cockroaches was upheld and unit owner was permanently enjoined from refusing access to her unit so that condominium association could spray to exterminate cockroaches); *LeFebvre v. Osterndorf,* 87 *Wis.*2d 525, 275 *N.W.*2d 154 (Ct.App.1979) (by-law requiring that no unit could be rented without prior written consent of Board of Directors upheld).

Courts have used various standards to review condominium rulemaking. A few courts have reviewed such rulemaking according to constitutional standards. Most courts, however, have reviewed condominium rulemaking by likening the Association to an administrative agency. For a discussion of these various standards, see Note, "Judicial Review of Condominium Rulemaking," 94 *Harv.L.Rev.* 647 (1981) (hereinafter Note, "Condominium Rulemaking"). As stated previously, however, this Court has concluded that the "business judgment" rule provides a more appropriate analytical framework for judicial review of condominium rulemaking. As the Appellate Division aptly noted below,

[a] two-pronged test has been established to determine whether the Association breached its fiduciary duty: (1) whether its action was authorized by statute or its own bylaws, and, if so, (2) whether the action was fraudulent, self-dealing or unconscionable. The scope of judicial review is limited to these two questions, which are issues of law. As long as the Association acted reasonably and in

good faith the courts will not second guess its conduct. [214 *N.J.Super.* 408, 411 (1986) (citations omitted).]

For a variety of reasons the use of the "business judgment" rule remains preferable to either a constitutional form of analysis or a "reasonableness" analysis that likens a condominium association to an administrative agency. As one commentator has observed,

[use of the business judgment rule] focuses attention on the bad faith of the condominium association—not the only source of danger for unit owners, but certainly the most significant one.... [I]t also provides a clear basis for reviewing the procedure of condominium rulemaking; and it permit[s] condominium associations and their counsel to refer to the extensive case law concerning the application of the business judgment rule to corporate decision-making.

[Note, "Condominium Rulemaking," *supra,* 94 *Harv.L.Rev.* at 666 (footnotes omitted).]

While the foregoing reasons lend support to our adoption of the "business judgment rule," I am most persuaded that it is the correct standard because it prevents judicial intervention into the private and consensual affairs of condominium associations. This court has expressed a reluctance to interfere in the affairs of membership associations. *See Falcone v. Middlesex County Medical Soc'y,* 34 *N.J.* 582, 590 (1961). In condominium associations, the unit owners agree to be bound by the master deed and the association's by-laws. Disputes between the association and unit owners should thus be settled through the mechanisms set forth in the condominium documents, not by the courts. Unnecessary judicial involvement of the sort the Court sanctions today may well result in more lawsuits brought by disgruntled unit owners against the Association and its Directors. Such a possibility may have a "chilling effect" on the participation of unit owners who serve without compensation as the Directors of the owners' association.

These public policy considerations compel the conclusion that there is no justification for a change in the standard the Court adopted in *Siller, supra,* 93 *N.J.* 370 for review of condominium board actions. The limited judicial review of association action provided by the "business judgment" rule fosters the ability of

private associations to manage their affairs without unnecessary judicial intervention and in a manner consistent with the condominium's organizational documents. There is neither a need, nor a public policy justification, for deviation from the principle that this Court will not second guess the conduct of a board of directors in the absence of a showing which is tantamount to bad faith.

## II.

Applying the "business judgment" rule to the facts in this case, I find that the regulation was reasonable and was adopted in good faith.

The powers of the Association arise from the Condominium Act, *N.J.S.A.* 46:8B-1 to 38 (the "Act"), and from the condominium master deed and by-laws. Each unit owner, when purchasing his or her unit, has the option of determining whether to sign the agreement and thus be bound by the master deed and by-laws. The amended offering and the master deed both expressly provide the Association with the discretion to set parking garage rentals. The amended offering plan contained the following provision:

> The garage will be deemed a part of the Common Elements and will be operated and maintained by the Association which shall have the *right to lease the operations thereof on such terms and conditions as it shall deem proper.* Each Apartment Owner, upon application will be entitled to rent annually from the Association at least one garage space. *Rentals for garage space will be established by the Association and shall be payable as the Association shall direct.* The rental ... shall not be increased so long as Sponsor is in control of the Association, but the amount actually charged may thereafter vary, as determined and established by the Association. All revenue *received by the Association from the garage operation shall be applied as provided by the Association's By-Laws.* (Emphasis Added.)

Both paragraphs four and nine of the master deed are consistent with the above provision. Paragraph four of the master deed provides that

> [use] of the Common Elements and the rights of the Unit Owner with respect thereto shall be subject to and governed by the ... rules and regulations of the Association. *The Association shall have the authority to lease or rent or*

*grant licenses or concessions with respect to the garage.... (Emphasis added)*

Paragraph nine is also instructive. It provides as follows:

PARKING AND GARAGE FACILITIES: The parking and garage facilities within the Property shall be part of the Common Elements and, subject to the provisions of the By–Laws, will be operated by the Association which shall have the right to lease all or part of the operation thereof on such terms and conditions as it may determine. Each Unit Owner, upon application, will be entitled to rent annually at least one garage space. *Rentals for garage space will be established by the Association and shall be payable as the Association shall direct. All revenue received by the Association from the garage operation shall be applied in accordance with the By–Laws. (Emphasis added.)*

Thus, under the amended offering plan and the master deed, parking and garage space were always treated differently from the other common elements, a factor the Court fails to recognize. Further proof of this difference is that a unit owner always entered into a lease with the Association for use of the parking facilities. Typical of such a lease was plaintiff's parking lease with the Association, dated September 7, 1979. That lease provided for an annual term, and read in pertinent part as follows:

3. In the event that the tenants shall either *fail to make timely payment of rent or shall intentionally or negligently damage the parking space or otherwise violate any duly adopted rules, regulations and/or policies of Landlord, then the Landlord may cancel this Agreement without any liability for so doing upon five (5) days written notice....*

4. The Landlord shall have the right to *change or modify the rental per annum,* thereby modifying the equal monthly installments payable by the Tenants, by giving written notice to the Tenants sixty (60) days prior to said rental modification becoming effective. In the event the *Tenants do not agree to said rental modification, the Tenants may terminate this Agreement* by giving written notice of their intention to terminate thirty (30) days prior to said rental modification becoming effective.

5. This Agreement cannot be assigned or sublet by the Tenant. After the condominium unit is sold the buyer has the right of first refusal on one of the seller's parking space(s) whether a single space or a tandem space. In such event, buyer will be required to enter into a lease with the Landlord for same.

6. This Agreement shall be deemed to be automatically renewed at the expiration of the term hereof for successive one (1) year periods; provided *that either party hereto may terminate this Agreement* by giving written notice of its intention not to renew to the other party thirty (30) days prior to the expiration date of the term hereof.

14. If the tenant fails to pay the aforesaid rentals ... the Landlord can, at his option and by giving appropriate written notice, TOW THE TENANT'S CAR FROM THE AFORESAID PARKING SPACE OR ANY OTHER PLACE WITHIN THE GARAGE PREMISES.... (Emphasis added.)

In 1981 the Association became aware that certain nonresident owners were charging their tenants parking fees that exceeded the fees charged to the owners by the Association. Accordingly, on June 2, 1981, the Board of Directors unanimously adopted a new schedule of charges for garage rentals that charged higher monthly fees to those occupants of the building who were not unit owners (tenants of nonresident owners). These rates were fixed according to the fair rental value of parking garage spaces in the prevailing Cliffside Park–Fort Lee market. At the same time, the Board of Directors crafted the parking garage rent increase to avoid any hardship, to provide for a transitional period, and to insure that ultimately, if the parking garage facility produced revenues, such revenues would be for the unit owners generally, rather than for specific individuals.

As expressed by the president of the Association, the new parking fee schedules were adopted for the following reasons:

As a result of the non-resident Unit Owner's attempt to commercially exploit the below-market parking rental fee charged by the Association, profits from the parking garage rentals were flowing to individual Unit Owners, instead of the Association, and its members, generally. The economic benefits of owning and operating the parking garage do not run to any individual Unit Owner, but rather to the Association for the good and welfare of all Unit Owners, as is clearly set forth in the Amended Offering Statement, Master Deed and By-Laws.

The Association also adopted the regulation to ensure building security by retaining control of the parking garage and regulate its use. The Association believed that unless regulations were imposed regarding control of parking spaces, nothing would prevent owners or tenants from subletting their parking spaces to individuals not residing in the building. Were such rentals to occur, the Association reasoned, it would be impossible to ensure building security for residents of the complex.

Given these facts, I conclude that the Association had the right to promulgate the parking regulation as authorized by the

condominium documents themselves, thus satisfying the first prong of the "business judgment" rule requiring us to determine whether the Association's action was authorized and correctly adopted.[1]

I focus, therefore, on the second part of the analysis, namely, whether the action establishing the parking garage increases was fraudulent, self-dealing, or unconscionable. I agree with the trial court's finding, affirmed by the Appellate Division, that "the increased fee was reasonable and was adopted in good faith." *Thanasoulis, supra,* 214 *N.J.Super.* at 412. There is no evidence in the record that the Association, in adopting its regulations, did not act in good faith for the benefit of all unit owners. Moreover, the Board has the right to determine who may park in the parking lot as a proper means of ensuring security within the complex. No one can doubt that the security of the condominium complex is a legitimate concern of the Association. Unlike the majority, I find under the "business judgment" rule that this reason alone is sufficient to sustain the regulation.

I find, as did both the trial court and the Appellate Division, that the Association did not engage in any self-dealing, fraud, or unconscionable conduct that would support a finding of

---

[1]The majority concludes that in the course of adopting the new parking fee schedule, the Association unilaterally amended paragraph eighteen of the master deed without obtaining approval of seventy-five percent of the unit owners. Accordingly, the Court finds that the Association's exercise of power was unauthorized. *N.J.S.A.* 46:8B–11. The Court's conclusion that paragraph eighteen was amended is plainly erroneous. Paragraph eighteen, which establishes the procedure unit owners are to follow in order to sell or lease their units, instructs potential lessors or sellers to provide the Association's Board of Directors with certain information, including "a copy of the offer, the name and address of the person(s) to whom the proposed sale, lease or transfer is to be made, *and such other information ... as may be required by the Board of Directors.*" (Emphasis added). The Association's declaration that no leases of units would be approved without a provision requiring the owner's tenant to lease the parking space directly from the Association at the increased rates thus falls squarely within the Association's authority as prescribed by paragraph eighteen.

breach of fiduciary duty. The Association's actions were not self-interested, but rather were taken for the benefit and good of the entire condominium community. Absent a finding to the contrary, the "business judgment" rule requires that the Association's actions be given due deference. If the plaintiff, or any other unit owner, feels aggrieved with the actions of the Board, remedies are readily available through the Association's by-laws to effectuate a change, namely, by persuading either the Board, or a sufficient number of unit owners, that the regulations are inappropriate or ill-advised. It is precisely for this reason that the "business judgment" rule has evolved, giving substantial deference to the actions of a condominium Board of Directors.

I reject the further contention that the parking garage fee regulation [2] "improperly converted to the use of all unit owners a property right granted by the master deed to individual unit owners." *Thanasoulis, supra,* 214 *N.J.Super.* at 417. There are two reasons that the action of the Board in revising the parking rates does not constitute a "change in a unit," in contravention of *N.J.S.A.* 46:8B–11[3]. First, the amended offering, master deed, and plaintiff's lease with the Association all specifically provided that the parking fees would be set, modified, and adopted by the Association. Accordingly, there was

---

[2] The dissenting opinion below incorrectly refers to the parking space fee increase as a by-law amendment. 214 *N.J.Super.* at 413. The action of the Board in question is not a by-law amendment. Rather, pursuant to the authority vested in the board by the Act, master deed and the lease between the plaintiff and the association, the Association simply changed the amount of rental charged for parking garage spaces. There was no change in the master deed or by-laws.

[3] *N.J.S.A.* 46:8B–11 (Supp.1987) provides, in pertinent part, as follows:
The Master Deed may be amended or supplemented in the manner set forth therein unless otherwise provided therein. Unless otherwise provided therein, no amendment shall change a unit unless the owner of record thereof and the holders of record of any liens thereon shall join in the execution of the amendment or execute a consent thereto with the formalities of a deed....

no change in the master deed or by-laws. The Association simply acted pursuant to the actual authority vested in the Board by the Act and master deed. Secondly, there is no change in the property rights of any party to this action by virtue of the parking rental changes. The Association continues to be the owner of all common elements, including the parking garage, and it has the right to fix parking garage rates. Plaintiff continues to be entitled to one parking garage space. His lease agreement with his tenant expressly provides that his tenant, the occupant of the building, will sign a parking garage lease directly with the Association. In short, there has been no "change" to the plaintiff's unit within the contemplation of *N.J.S.A.* 46:8B–11.

My application of the "business judgment" rule to the parking-garage regulation leads to the conclusion that the Association acted properly within the scope of its authority in promulgating the regulation, that adoption of the regulation was procedurally correct, and that the Association did not breach its fiduciary duty to the unit owners.

Justices HANDLER and POLLOCK join in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, O'HEARN and STEIN—4.

*For affirmance in part, and reversal in part*—Justices HANDLER, POLLOCK and GARIBALDI—3.