In the Matter of 560 OCEAN CLUB, L.P., Debtor.

560 OCEAN CLUB, L.P., Alan I. Gould, Trustee in Bankruptcy for 560 Ocean Club, L.P. and RTU Legal Committee of Members, Plaintiffs,

v.

OCEAN CLUB CONDOMINIUM ASSOCIATION, a New Jersey not-for-profit corporation and City of Atlantic City, a Municipal Corporation of New Jersey, Defendants.

Bankruptcy No. 90–12450.
Adv. No. 91–1264.

United States Bankruptcy Court,
D. New Jersey.

Oct. 24, 1991.

Alan I. Gould, Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, Atlantic City, N.J., for trustee.

E. Richard Kennedy, Montville, N.J., Thomas Heitzman and Hannoch Weisman, Trenton, N.J., for Ocean Club Condominium Ass'n.

John M. Donnelly, Clapp & Eisenberg, Atlantic City, N.J., for RTU Legal Committee of Members.

Michael Land, Atlantic City, N.J., for debtor 560 Ocean Club, L.P.

Judith Reich, Drinker, Biddle & Reath, Princeton, N.J., for Cent. Pennsylvania Sav. Ass'n.

Samual D. Lashman, Parker, McCay & Criscuolo, Linwood, N.J., for City of Atlantic City.

## OPINION ON MOTION OF PLAINTIFFS FOR PARTIAL SUMMARY JUDGMENT AND CROSS–MOTION OF DEFENDANT OCEAN CLUB CONDOMINIUM ASSOCIATION FOR SUMMARY JUDGMENT

JUDITH H. WIZMUR, Bankruptcy Judge:

Plaintiffs seek partial summary judgment on Counts 1 and 3 of the adversary complaint. In particular, plaintiffs seek a declaration that a regulation enacted by the Ocean Club Condominium Association (OCCA) restricting leasing opportunities of Ocean Club unit owners be declared void and unenforceable. In addition, plaintiffs seek the entry of an order enjoining and restraining the OCCA from interfering with or hindering the right-to-use (RTU) program by the debtor, 560 Ocean Club, L.P., at the Ocean Club. OCCA seeks summary judgment on all counts of plaintiffs' complaint.

### FACTS

On April 7, 1982, final site plan approval was obtained in connection with the construction of a high-rise luxury condominium building, the Ocean Club, comprised of 725 non-commercial and 29 commercial units. The Ocean Club is located on the boardwalk in Atlantic City, New Jersey. A master deed creating and establishing the "Ocean Club Condominium" (OCC), together with by-laws dated October 16, 1984, was properly recorded in accordance with statutory requirements. N.J.S.A. 46:8B–8. A certificate of occupancy was issued for the building on May 14, 1987. Units were

sold to individual owners for residential purposes, as well as for investment purposes relating to rentals of units.

For the first several years during the occupancy of the building, there were no restrictions on the length of time permitted for the rental of a unit. Advertising for the sale of units indicated that a rental agency was available to secure annual, monthly or weekly rentals for unit owners.

Debtor commenced operations in the building in May 1987, following several presentations to the Association Board of Trustees in early 1987.[1] Debtor has been engaged in the business of leasing and subleasing OCC condominium units owned and leased by debtor via a "right-to-use" concept, a weekly timeshare arrangement which recurs over successive years.[2] Debtor alleged that in excess of $6,000,000 was spent establishing sales and marketing facilities, setting up computer capabilities, renovating 140 units and furnishing 60 units.

Both formal and informal expressions of concern regarding the operations of the debtor at the Ocean Club were noted following the commencement of sales of RTU leases by the debtor in May 1987. At the June 14, 1987 meeting of the Board of Trustees, unit owners criticized debtor's concept and sales procedures. Debtor's marketing efforts included placing solicitors on the Atlantic City boardwalk to interest passersby in purchasing right-to-use slots in condominium units. A law suit was commenced against the debtor, the details of which have not been provided by either party, which apparently sought to enjoin the debtor from positioning more than one solicitor on the boardwalk at one time. A hearing before Judge Anthony Gibson, Judge of the Superior Court of New Jersey, Law Division, held on July 2, 1987, produced guidelines and restrictions concerning the debtor's sales operations, to which the debtor agreed. During the initial phases of debtor's operation in the summer of 1987, the Board imposed upon debtor the requirement that the debtor's leases and sub-leases include the following designation:

"This lease is subject to the approval of the Ocean Club Board of Trustees and/or the appropriate condominium entity."

In January 1988, the City of Atlantic City notified OCCA that in order to continue short-term rentals, OCCA would be required to secure necessary land use compliance certificates and mercantile approvals. In response, OCCA applied for and received conditional approval from the Atlantic City Planning Board for amendment to final site plan approval to allow for the daily rental of units to transient visitors.[3]

The debate among unit owners, the Board of Trustees of the OCCA, and the rental committee appointed by the Board to review the rental program at the Ocean Club, both as it applied to the debtor and as it applied to unit owners who were interested in renting their units, continued through 1988 and 1989. By resolution approved and adopted by the Board on April 30, 1989,[4] the OCCA specified certain requirements for approval of residential leases, which approval is required under the Condominium's Master Deed. No approval

---

1. When the debtor's operation was proposed, the concept was presented to the OCCA Board of Trustees and approved. In addition, the Board approved specific requests of the debtor to make minor adjustments in the building, such as providing storage space for linens and cleaning supplies, installing computer terminals and computerized telephone system and hiring additional service staff to service debtor's clientele. These approvals were effected at a meeting of the OCCA Board of Trustees on April 5, 1987.

2. OCCA contends that the leasing arrangements entered into by debtor were sometimes as short as one or two nights. This dispute need not be resolved for this discussion.

3. Although OCCA's General Manager notified the Planning Board, in an undated letter, that the various conditions attached to the resolution, passed at the hearing on July 20, 1988, and dated November 2, 1988, were complied with, the record does not reflect certification of compliance by the Planning Board.

4. The resolution was first vetoed by a member of the Board, which veto appears to have been rescinded at the Board meeting on May 28, 1989.

process had been employed by the Board prior to the resolution. The requirements included maximum occupancy figures, security for payment of common assessments, and an application fee schedule which ranged from $10 for a "short-term" lease (30 or fewer consecutive days), to $250 for a "long term" lease (a consecutive period in excess of one year, or for any period occurring more than one year from the first date of the initial occupancy, such as a lease for a recurring period over several successive years).

In September 1989, debtor sued OCCA to challenge certain OCCA requirements for lease approvals. That state court action, stayed by debtor's chapter 11 filing in September 1990, remains unresolved.

On February 25, 1990, the Board adopted a "Resolution Amending Policy & Procedure for the Approval of Leases by Adopting Minimum Lease Periods". The resolution proposed to phase in a 5-year program which would ultimately limit leases to a 90-day period during the summer months and a 30-day period in the winter months.

The limitation on the minimum time period for rentals occasioned the filing of several law suits in Superior Court, which were consolidated with the pending action by debtor against OCCA.[5] Also consolidated with the pending litigation was an action initiated by the City of Atlantic City against OCCA in Superior Court to enforce a decision of the Atlantic County Construction Board of Appeals, entered July 16, 1990, which upheld a notice of violation issued by the City of Atlantic City against OCCA on June 28, 1990. The notice of violation asserted that the use group of the Ocean Club "has been improperly changed from a R–2 Use Group to a mixed R–1/R–2 Use Group".

Debtor filed its chapter 11 bankruptcy petition on September 21, 1990. At a meeting of the OCCA Board of Trustees on November 11, 1990, the Board agreed in concept to a consensual arrangement which would resolve all pending litigation, with the exception of matters involving the debtor. The proposed arrangement would establish minimum lease periods of 90 days for the summer season, and 30 days for all other periods.

The consent order and declaratory judgment, entered into by all parties except the debtor, was approved by the Superior Court and entered of record on April 16, 1991. In pertinent part, the consent order validated OCCA's Policy & Procedure for the approval of leases, revised the minimum apartment lease periods to 90 days during summer season and 30 days for all other periods, and dismissed the notice of violation issued by the City of Atlantic City against OCCA. The order specifically provided that because all proceedings involving the debtor are stayed pursuant to the automatic stay entered in debtor's bankruptcy case, "the provisions of this judgment do not apply to 560 Ocean Club, L.P.". The Board revised its Policy & Procedure for the approval of leases in conformance with the consent order by formal resolution at a regular meeting on July 12, 1991.

Debtor owned nine units at the time it filed its chapter 11 petition, including four units which have since been returned to MLM Associates, the developer, by deeds in lieu of foreclosure. The remaining five units are subject to mortgages in favor of

---

5. The actions are described in defendant's appendix as follows:

*560 Ocean Club, L.P. v. Ocean Club Condominium Association,* an action filed by 560 Ocean Club to invalidate the Association's Policy & Procedure for the approval of leases, to enjoin the Association from reviewing, approving or disapproving the 560 leases and to enjoin the Association from collecting lease approval fees;

*Zelikovsky & Price v. Ocean Club Condominium Association and MLM Associates,* an action filed by two unit owners to compel the Association to review and approve or disapprove of all leases and to ban short term leases. The plaintiffs also sought damages against MLM Associates, the developer, and OCCA for permitting short term leases, and against MLM for misrepresentations allegedly made at the time of sale.

*Skoda Enterprises v. Ocean Club Condominium Association* and *Powers v. Ocean Club Condominium Association,* actions brought by investors/owners to invalidate the February 1990 amendment to the Association's Policy & Procedure for the approval of leases.

Central Pennsylvania Savings Association (CPSA). In addition, debtor rents units as needed to satisfy the needs of the RTU program. If allowed to continue its business activities, debtor proposes to use between thirty (30) and fifty (50) units for the RTU program. No RTU leases have been sold by the debtor since passage of the February 1990 time limitation for rentals.

## PROCEDURAL HISTORY

Plaintiffs filed this adversary proceeding on July 22, 1991, against OCCA and the City of Atlantic City seeking various types of relief. In Count 1, plaintiffs seek judgment declaring the Policy & Procedures adopted by the OCCA to be void *ab initio* and enjoining the defendants from interfering with or hindering debtor's activities to market and sell RTU units at the Ocean Club on a weekly basis. Additionally, plaintiffs seek compensatory and punitive damages for the alleged wrongful acts of OCCA in attempting to terminate the rights of debtor and RTU owners. In Count 2, plaintiffs demand declaratory relief that the RTU program at the Ocean Club does not convert the building from an R-2 to R-1 use and restraints against the City of Atlantic City from taking any action against the building based on such a designation. In the third count, plaintiffs seek to enjoin OCCA from placing limitations on the time a unit may be rented, unless such limitations are adopted by seventy-five percent (75%) of the unit owners, and declaring null and void any such existing limitation. In Count 4, plaintiffs seek damages for alleged breach by the OCCA Board of their fiduciary responsibilities. The fifth count alleges that the existing Board of Trustees of the OCCA is illegally constituted and seeks a declaration that all actions of the Board are null and void. Count 6 contends that an active conspiracy among the members of the OCCA Board of Trustees to extinguish or impair the rights of the debtor, the RTU leases and the other unit owners must be enjoined. Lastly, Count 7 charges that the OCCA Board has caused the plaintiffs severe economic harm and has interfered with their prospective economic advantage requiring defendant OCCA to be responsible for compensatory and punitive damages.

It should be noted that defendant OCCA has filed a motion to declare this adversary proceeding as non-core. A scheduling for submissions on the question has been provided. If the matter is determined to be a core proceeding, the within decision shall constitute the final decision of the Bankruptcy Court, subject to appeal opportunities under 28 U.S.C. § 158. If the matter is determined to be non-core under 28 U.S.C. § 157(c), the within decision shall constitute the Bankruptcy Court's Findings of Facts and Conclusions of Law, subject to the entry of a final order by the District Court.

## DISCUSSION

1. *Authority of the Ocean Club Condominium Association to Restrict Short Term Leases.*

■ Judicial review of actions by condominium associations requires an analysis, in the first instance, of whether OCCA's action to promulgate a regulation curtailing short-term leases was within its authority as specified by the Condominium Act, N.J.S.A. 46:8B–1 et seq. and the OCC Master Deed. *Thanasoulis v. Winston Towers 200 Association*, 110 N.J. 650, 542 A.2d 900 (1988).

In *Thanasoulis*, the New Jersey Supreme Court held that defendant Condominium Association exceeded the scope of its power under the Condominium Act and its master deed when it promulgated a rule charging non-resident unit owners higher monthly parking fees than it charged resident owners. The master deed authorized the Association to operate the parking and garage facilities with:

> ... the right to lease all or part of the operation thereof on such terms and conditions as it may determine. Each unit owner, upon application, will be entitled to rent annually at least one garage space. Rentals for garage space will be established by the Association and shall be payable as the Association shall direct. All revenue received by the Associ-

ation from the garage operation shall be applied in accordance with the by-laws. *Id.* at 653, 542 A.2d 900.

The Supreme Court couched the issue presented as the "condominium association's power to alter the property rights of unit owners guaranteed by the [Condominium] Act and the master deed." *Id.* at 657, n. 4, 542 A.2d 900. The court cited several provisions of the Condominium Act to conclude that the Association exceeded its authority under the Act, including N.J.S.A. 46:8B–4, which designates each condominium unit as a separate parcel of real property that may be dealt with by the owner in the same manner as is otherwise permitted by law for any other parcel of real property; N.J.S.A. 46:8B–10, which affords the same force and effect of a deed, mortgage, lease or other instrument pertaining to a unit as would be given to a like instrument pertaining to other real property; and N.J.S.A. 46:8B–15(c), which permits the leasing by the Association of the use of common elements "in a manner not inconsistent with the rights of unit owners". *Id.* at 660, 542 A.2d 900.

Although the court noted the Association's discretionary power under the master deed to establish rental rates for the parking and garage facilities, the court concluded that the Association "cannot expropriate the economic value of plaintiff's parking space for its own use. As a unit owner, plaintiff has the right to lease his unit, which includes his parking space and his interest in the common elements. The economic reality of the new regulations is that the Association has effectively confiscated for its own use the value of plaintiff's parking space." *Id.* at 661, 542 A.2d 900.

As well, the *Thanasoulis* court determined that the new regulation charging non-resident unit owners higher monthly parking fees than was charged resident owners constituted a proscribed "change in a unit", under N.J.S.A. 46:8B–11, which could not be effected without the owner's consent. *Id.* at 665, 542 A.2d 900.

In applying the analytical framework of the *Thanasoulis* court to the case present-ed here, we must focus on certain provisions of the Act and the OCC Master Deed. A condominium is created by the recording of the master deed. N.J.S.A. 46:8B–8. The Act requires the master deed to contain certain information, including any "restrictions or limitations upon the use, occupancy, transfer, leasing or other disposition of any unit (provided that any such restriction or limitation shall be otherwise permitted by law) and limitations upon the use of common elements." N.J.S.A. 46:8B–9(m). Each condominium unit constitutes "a separate parcel of real property which may be dealt with by the owner thereof in the same manner as is otherwise permitted by law for any other parcel of real property." N.J.S.A. 46:8B–4. A unit owner owns a unit in fee simple, N.J.S.A. 46:8B–3(q), and a lease or other instrument pertaining to a unit has the same force and effect in regard to such unit as would be given to a like instrument pertaining to other real property. N.J.S.A. 46:8B–10.

■ The import of the various sections of the Condominium Act cited is that a condominium ownership interest constitutes a separate parcel of real property that the owner may deal with as he would any parcel of real property. *Siller v. Hartz Mountain Assoc.*, 93 N.J. 370, 375 (1983), *cert. den.* 464 U.S. 961, 104 S.Ct. 395, 78 L.Ed.2d 337. Although an owner of a condominium unit "faces certain restrictions of ownership rights when entering into a condominium arrangement," *Thanasoulis v. Winston Towers 200 Association, supra,* 110 N.J. at 665, 542 A.2d 900 (Garibaldi, J., dissenting), those restrictions must be designated in the master deed and may not be inconsistent with the provisions of the Condominium Act. Restrictions or limitations upon the leasing of any unit must be specified in the recorded master deed.

■ The OCC Master Deed includes the following references to the leasing opportunities of unit owners:

7. Administration of Condominium: The Association. The Condominium and the Condominium Property shall be administered, supervised and managed by

the Association which shall act by and on behalf of the unit owners of the units in the condominium in accordance with the condominium documents, the by-laws composing part thereof and in accordance with the Condominium Act.... [T]he Association is hereby designated as the form of administration of the condominium, and the Association is hereby vested with the rights, powers, privileges and duties necessary or incidental to the proper administration of the condominium as set forth in the Condominium Document. The Association shall also be empowered and is hereby empowered and shall be obliged: ... (v) to approve or disapprove of sales or leases of units as herein specified; ...

21. Lease of Units. No Unit Owner shall be permitted to lease less than the entire unit. Any lease agreement shall be required to provide that the lease shall be subject in all respects to the provisions of the Master Deed, By–Laws and Rules and Regulations of the Condominium and that any failure by the lessee to comply with the terms of such documents shall be a default under the lease. All leases shall be required to be in writing, and be approved by the Board of Trustees ...

The restrictions or limitations noted in the Master Deed on the issue of leasing include the following:

1. a unit owner must lease the entire unit;
2. the lease agreement must provide that the lease is subject to the provisions of the Master Deed, By–Laws and Rules and Regulations of the condominium;
3. the lease agreement must provide that any failure by the lessee to comply with the terms of such documents shall be a default under the lease;
4. all leases must be in writing;
5. all leases must be approved by the Board of Trustees.

There is no specific reference in the Master Deed to the opportunity of the Association to restrict or limit the duration of leases. The question becomes whether the authority to approve or disapprove of leases of units includes the authority to promulgate a rule restricting leases to a minimum of 90 days during the summer months and 30 days at all other times. Given the conceptual framework provided by the New Jersey Supreme Court and the statutory framework of the Condominium Act, which established that a condominium unit owner retains all real property ownership rights subject to the specific restrictions designated in the Master Deed, it must be concluded that the Master Deed, authorizing the Board to approve or disapprove of leases, is insufficient to support the regulation in question.

In concluding that the Association exceeded its authority under the Master Deed to restrict the permissible duration of leases, we need not find as a factual matter that such an action would "effectively shut down the rental program", as suggested by the plaintiffs. The actual impact of the rental restriction may be subject to debate. The point is that the Association is simply not authorized under the Master Deed to restrict the term of leases. In *Thanasoulis*, we find more compelling language than we have presented here specifically authorizing the Association to operate the parking garage "on such terms and conditions as it may determine", to establish rates for garage space and to make such rentals payable "as the Association shall direct". The New Jersey Supreme Court concluded that the master deed did not authorize the Association to overcome the individual ownership right of the non-resident unit owner to lease a parking space from the Association in the same manner as a resident unit owner could do. Notwithstanding justification offered by the Association for its rule, including security concerns, the court simply found that the Board had no authority to act. If the Association in the *Thanasoulis* case lacked sufficient authority to support the parking rates it established, then surely the lack of authority of the OCCA here to restrict the duration of leases is obvious.

OCCA's argument that to fail to recognize the Board's rule-making authority to

restrict the duration of rental arrangements would render the requirement for Board approval of leases a nullity must be rejected. The debtor provides persuasive suggestions for the scope and meaning of the Board's approval authority, including that the written lease will be approved if it is consistent with the provisions of the condominium documents, and/or that approval of the written lease may not be unreasonably withheld. *See e.g., Laguna Royale Owners Association v. Darger*, 119 Cal.App.3d 670, 174 Cal.Rptr. 136 (Cal.Ct. App.1981).

Other condominium documents support the conclusion that the Master Deed does not authorize the OCCA to restrict lease terms. The by-laws permit lessees to enjoy the Condominium Property to the extent that each unit owner is entitled.[6] The time frame for leasing a unit is referenced in paragraph 10 of the by-laws to reflect the opportunity of the OCCA to impose a fee upon a unit owner leasing his unit for a period of time that would require the lessee to receive mail, visitors and the like.[7] In the Public Offering Statement of the Ocean Club Condominium, issued pursuant to the New Jersey Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A–21, et seq., first registered on or about May 4, 1982,[8] a Unit Owner is permitted to lease his unit, subject to the Master Deed, By-Laws and Rules and Regulations of the Association.[9] In addition, the Public Offering Statement specifically permits lessees to use common recreation and community facilities.[10]

In reaching the conclusion that the OCCA has exceeded its authority under the Condominium Act and its governing Master Deed, we are mindful that the Association has substantial latitude to govern the operations of the entire condominium property, and that deference to the actions of the condominium Board of Trustees must be afforded absent a demonstration of bad faith. The so-called "business judgment" rule, adopted in *Papalexiou v. Tower West Condominium*, 167 N.J.Super. 516, 401 A.2d 280 (Ch.Div.1979), as analogous to the actions of a board of directors of a corporation, requires "the presence of fraud or lack of good faith in the conduct of a corporation's internal affairs before the decisions of a board of directors can be ques-

6. By-laws, Article 1, Paragraph 4, as follows:

   In the event that a Unit Owner shall lease or permit another to occupy his Unit, the tenant or occupant shall be permitted to enjoy the Condominium Property to the extent that such Unit Owner shall be entitled, but shall not vote in the affairs of the Association unless he shall be designated the Voting Representative. The use of the Condominium Property shall be limited to Unit Owners, tenants and occupants of Units and their licensees, invitees, servants, agents and employees.

7. By-laws, Article 4, Paragraph 10, Section E, as follows:

   The Board may impose upon each Unit Owner, and each subsequent Unit Owner, upon acquisition of title to his Unit, a non-refundable fee in an amount to be determined by the Board, but not to exceed $250.00. If imposed, payment of such fee shall be a condition precedent to membership in the Association. In the case of a Unit Owner leasing his Unit for a period of time that would require the registration of the lessee to receive mail, be placed on an occupant's listing to receive visitors, etc., then the Board may impose a similar fee upon the Unit Owner, which fee shall not exceed $250 for each such rental. Any unpaid fee shall be deemed a lien on the unit in the same manner as any unpaid common expenses attributable to each unit.

8. It appears that the Public Offering Statement, which was amended five times through August 18, 1988, was subsequently amended to reflect the limitations on rentals adopted by the Board on April 30, 1989, as well as the subsequent resolution establishing a minimum rental period. The record presented does not reflect whether, or when, the Sixth Amended Public Offering Statement was filed.

9. The Public Offering Statement, Page 3, provides in pertinent part:

   The interest held by a Unit Owner in the condominium is similar to many other ownership interests in real property with respect to the rights and obligations which attach thereto ... In addition, a Unit Owner is permitted to lease his unit, but will be subject to certain restrictions, as contained in the Rules and Regulations, By–Laws and Master Deed.

10. The Public Offering Statement, Page 8, Paragraph 5, as follows:

    ... Unit Owners may, by written agreement and upon notice to the Board, delegate their right of enjoyment and use of the recreation and health club and/or parking facilities to their permitted lessees.

tioned." The *Papalexiou* court explained that:

> If the corporate directors' conduct is authorized, a showing must be made of fraud, self-dealing or unconscionable conduct to justify judicial review. This presents an issue of law rather than of fact. [citation omitted]. Although directors of a corporation have a fiduciary relationship to the shareholders, they are not expected to be incapable of error. All that is required is that persons in such positions act reasonably and in good faith in carrying out their duties. [citations omitted]. Courts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence. [citation omitted]. 167 N.J.Super. at 527, 401 A.2d 280.

*See also Siller v. Hartz Mountain Assoc.,* 93 N.J. 370, 461 A.2d 568 (1983).

As in *Thanasoulis, supra,* the principles of "business judgment", second-guessing, and allegations of bad faith are not in issue. The task here is not to determine the desirability or popularity of the regulation, or even whether there is a reasonable justification for the regulation. The conclusion here is simply that the Condominium Act and Master Deed do not provide authority for the OCCA's action.

It is interesting to note, as plaintiffs have done in their reply submission, that a sample draft of a master deed, contained in a widely accepted treatise on New Jersey Condominium Law, offers the following proposal for inclusion in a master deed:

> 6:11.03 *Restrictions on Leasing.* Except as hereinafter provided, no Unit shall be leased by the owner thereof ... or otherwise utilized for transient or hotel purposes, which shall be defined as (i) rental for any period less than one hundred eighty (180) days; or (ii) any rental where the occupants of the Unit are provided customary hotel services, such as room service for food and beverages, maid service, furnishing laundry and linen, and bellboy service. No Unit Owner may lease less than an entire unit.

Wendell A. Smith, *New Jersey Condominium Law: A Practical Guide to Condominiums and Other Common Interest Projects* 93, (1985). The contrast between the specific time restriction on leasing contained in the proposed master deed in Mr. Smith's practical guide, versus the general requirement in the OCC's Master Deed requiring approval of the Association for leases, is stark. The contrast lends support for the proposition that without specification of such a restriction, an Association Board may not promulgate a regulation restricting rental duration.

■ Further, the Board's action in curtailing short-term rentals must be invalidated as a "change in a unit", contrary to N.J.S.A. 46:8B–11, which proscribes such changes without the consent of the Unit Owner.[11] In *Thanasoulis, supra,* the phrase "change in a unit" was defined by the New Jersey Supreme Court to mean that "a unit owner should retain essentially the same property rights originally deeded to him for as long as he owns his unit, unless he affirmatively consents to their being altered." 110 N.J. at 663, 542 A.2d 900. Because the revised parking rules in *Thanasoulis* had the effect of "confiscating" a portion of the property interest acquired by the unit owner when he purchased his unit, the revised rules of the Association were held to constitute a "change" in the unit in contravention of the Act. *Id.*

Similarly, here, the revised rental regulations establishing strict time frames for the duration of leases effectively confiscates a portion of the property interest acquired by plaintiff 560 Ocean Club, as unit owner, when it purchased its units. Therefore, the rental limitation passed by the Association must be invalidated as a "change" in plain-

---

11. N.J.S.A. 46:8B–11. Amendments to master deed:

> The master deed may be amended or supplemented in the manner set forth therein. Unless otherwise provided therein, no amendment shall change a unit unless the owner of record thereof and the holders of record of any liens thereon shall join in the execution of the amendment or execute a consent thereto with the formalities of a deed ...

tiff's units, without its consent, in contravention of the Condominium Act.

■ Authority to promulgate regulations restricting the duration of leases may be achieved by amendment to the master deed. The Condominium Act permits such amendment "in the manner set forth" in the master deed. N.J.S.A. 46:8B–11. Amendment to the OCC Master Deed requires the approval of seventy-five percent (75%) of the Unit Owners.[12] However, any such amendment may not validate an *ultra vires* action by OCCA. An amendment to the Master Deed proscribing short-term leases would constitute a "change in a unit" requiring the consent of each current unit owner, N.J.S.A. 46:8B–11, and may only be applied prospectively to new unit owners. Therefore, any lease and/or RTU arrangement entered into prior to such an amendment cannot be disturbed. *Breene v. Plaza Tower Ass'n.*, 310 N.W.2d 730 (Sup.Ct.N.D.1981) (a restriction adopted after the purchase of a unit is not enforceable against the purchaser except through the purchaser's acquiescence).

Partial summary judgment in favor of the plaintiffs on Counts 1 and 3 is granted as follows. The resolution adopted by the OCCA Board on February 25, 1990, "Amending Policy & Procedure for the Approval of Leases by Adopting Minimum Lease Periods" is invalidated. OCCA is enjoined from placing limitations on the time a unit may be rented, unless the Master Deed is amended by the vote of seventy-five percent (75%) of the unit owners. Any such amendment may have prospective application only.

### 2. *Restrictions and Covenants Under the Master Deed.*

Paragraph 11 of the Master Deed provides as follows:

11. Restrictions and Covenants. *Each apartment unit is intended to be and shall be used as a private residence only.* This restriction shall not pertain to the commercial units as designated herein.

The Grantor and every Unit Owner by the acceptance of the Unit Deed, and their heirs, successors and assigns covenant that they will faithfully observe all of the terms, covenants and conditions wherever imposed in the Condominium Documents.

Each Unit Owner, his heirs, successors and assigns further covenant that:

(I) he will not use, cause or permit the Unit to be used other than as provided in the Condominium Documents, nor will cause the Unit to be subdivided, changed or altered, except for the Commercial Unit as provided for herein, without first having obtained the written approval of the Association; except that it is expressly understood that interior alterations to the Units are permitted by the Unit Owners, if permitted by local building codes and approved by the Board of Trustees;

(II) *he will not use, permit or allow the Unit or any part thereof to be used for an offensive or unlawful purpose* nor will he permit or allow any nuisance within the Unit, nor will he use, permit or allow the Unit to be used in a manner which will be a source of annoyance to the residents or which in any way interferes with the peaceful possession, enjoyment and proper use of the Condominium Property by the other residents. (emphasis added).

### a. Private Residence Only.

■ The OCCA cites Paragraph 11 of the Master Deed to support the proposition that a rental restriction which protects the private residential nature of the condominium project is authorized under this section. The restriction contained in the Master Deed that each apartment unit must be used as a private residence only cannot validate the rental restriction passed by the OCCA. Either standing alone, or in the context of the other references to leasing opportunity contained in the Master Deed and other condominium documents, as noted above, there can be no notice to unit owners by this restriction that rental opportunities may be substantially curtailed.

---

**12.** OCC Master Deed, Paragraph 12.

However, the restriction and/or covenant must be examined in terms of the Association's challenge to the opportunity of the plaintiff, 560 Ocean Club, to continue to operate on the premises.

Debtor contends that the restrictive covenant in the Master Deed limiting the use of each apartment unit as a "private residence only" means that each unit may be used for residential purposes only, and that business activities may not take place within the confines of each unit. The restriction, according to debtor, does not proscribe the generation of rental income from the leasing of units. Debtor is correct that the covenant on its face does not preclude the generation of rental income, and we have so found. However, debtor's limited reading of the restrictive covenant must fail.

In Francis M. Dougherty, Annotation, "Restrictive Covenant Limiting Land Use to 'Private Residence' or 'Private Residential Purposes': Interpretation and Application", 43 ALR 4th 71, 76 (1986), we are instructed that the phrase "private residence" as a restrictive covenant not only limits the use of property so restricted to residential purposes within the confines of the residence, but also proscribes residential purposes of a public nature, such as hotels and general public boarding or apartment houses. The following explanatory summary is helpful:

> As a general proposition, restrictive covenants built around the terms "residence" or "residential purposes" or "dwelling" or "dwelling house," without more, merely limit the use of the property to living purposes as distinguished from business or commercial purposes. However, when the word "private" is used in covenants to modify the word "residence" or "residential purposes" the covenant is generally given a much more restricted meaning. (footnote omitted).

> Although on occasion the phrase a "private residence," as used in covenants which provide that property is to be used for private residences only, has been construed as allowing a building to be inhabited by more than one family, the word "private" when used in conjunction with

the words "residence" or "dwelling" in such covenants has generally been interpreted as restricting use of the property to one family only.... Moreover, it has been held that the use of the word "private," in a covenant which restricts the use of property to private dwellings, excludes all buildings which are used for residential purposes of a public nature, such as hotels and apartment houses.

Cases cited by OCCA on this point generally support the proposition that the conduct of a commercial enterprise to lease condominium units is proscribed by a restrictive covenant that limits the use of real property for "a private residence only". In *Carr v. Trivett*, 24 Tenn.App. 308, 143 S.W.2d 900 (1940), a commercial tourist home operation was enjoined where a restrictive covenant required use of the property for residential purposes and proscribed any business use. The *Carr* court distinguished between an occasional rental of the premises and the licensed commercial enterprise of the tourist home, which advertised to the general public and generated a substantial income. The court held that such commercial operations are beyond the spirit and purpose of the restrictions and tend to break down the general protective force of restrictions intended as a mutual benefit and protection to all parties who might establish private dwellings in that section. *Id.* at 904.

Similarly, in *Deitrick v. Leadbetter*, 175 Va. 170, 8 S.E.2d 276 (1940), the court concluded that conducting a tourist home in a house located in a residential district in which deeds were restricted "for residential purposes" only was violative of the restrictive covenant. As the court noted, "... if [the tourist home] is a business, then this lot is not being used for 'residential purposes' only." *Id.* 8 S.E.2d at 278. Other contexts in which courts have distinguished "commercial" versus "residential" uses, focusing on the nature of the enterprise making the leasing arrangements rather than the residential character of the occupancy of a dwelling unit include *American Savings Association v. Conrath*, 123 Ill.App.3d 140, 78 Ill.Dec. 730, 462 N.E.2d 849 (1984), *Hambright v. Ygle-*

*sias,* 200 N.J.Super. 392, 491 A.2d 768 (App.Div.1985), and *Morristown Memorial Hospital v. Wokem Mortgage and Realty Co., Inc.,* 192 N.J.Super. 182, 469 A.2d 515 (App.Div.1983).

To be distinguished here is the case of *Laguna Royale Owners Association v. Darger,* 119 Cal.App.3d 670, 174 Cal.Rptr. 136 (Ct.App. 4 Dist.1981), where the condominium premises were required by the authorizing documents to be used "solely for residential purposes". The condominium association brought suit seeking a declaration that the assignment of one condominium owner's interest to four separate interest holders should be invalidated as contrary to the private single-family residential character of the project. The appellate court validated the condominium owner's action, holding that the association's disapproval of the proposed assignment was not reasonable. *Laguna Royale* is distinguished primarily by the absence of any indication that the proposed assignment was for commercial purposes. Rather, the transaction proposed a single division of ownership by one unit owner to himself and three other families.

Here, there is no dispute that debtor's operation is strictly a commercial enterprise. As reflected in the adversary proceeding filed herein, debtor "is and has been engaged in the business of selling and renting via a 'right-to-use' concept." There is no contest that debtor's operation requires advertising and marketing, access to the building for touring of the premises by prospective customers and a commercial presence in the building to service the right-to-use operation. While individual investors in the building, who are presently not precluded from renting their units, may engage in several of these activities, the difference in scale and proportion between the activities of a private investor and the activities of the debtor's business enterprise is apparent. OCCA is correct that the restrictive covenant contained in the Master Deed, limiting use of each apartment unit "for private residences only", precludes the debtor's commercial operations on the premises.

Plaintiffs' motion for partial summary judgment is denied, insofar as plaintiffs seek to enjoin OCCA from interfering with or hindering debtor's activities in marketing and selling RTU interests in units at the Ocean Club. Defendant's cross-motion for summary judgment on Counts 1 and 3 in this regard is granted.

b. *Unlawful Purpose.*

■ On May 14, 1987, a certificate of occupancy was issued for the Ocean Club Condominium, which certificate specified an R–2 use group classification. The R–2 classification applies to multi-family dwellings in which the occupants are primarily not transient in nature. The notice of violation issued by the City of Atlantic City on June 28, 1990, charged the Ocean Club Condominium with violating its certificate of occupancy by allowing the rental of units for a period of less than 30 days. The Atlantic County Construction Board of Appeals affirmed the violation. The City of Atlantic City brought suit against OCCA in Superior Court to enforce the decision of the Construction Board of Appeals. The matter was resolved as between the City and OCCA by a consent order entered April 16, 1991, wherein OCCA affirmed the self-imposed restriction on the duration of leases, and the City dismissed the notice of violation. The order specifically exempted the debtor from its impact.

OCCA contends that the restrictive covenant in the Master Deed proscribing the use of any unit for an "unlawful purpose" precludes the operation of the debtor, as violative of the New Jersey Uniform Construction Code, BOCCA and National Building Code. *See, e.g.,* N.J.A.C. 5:23–7 et. seq. Debtor responds that there is no violation of the New Jersey Uniform Construction Code because the occupants of the building are not "primarily" transient in nature. N.J.A.C. 5:124.5–(15). Further, debtor contends that even if the City is correct that the nature of the rental use by debtor of various units constitutes a change in use classification to R–1, debtor could readily accomplish the modifications that might be necessary to correct the violation.

The City of Atlantic City questions the opportunity of the debtor to assert defenses to the City's enforcement action. The City contends that debtor, as an individual unit owner, cannot challenge the City's action, but is bound by the consensual arrangement achieved between the City and OCCA, the responsible party for the building. More notably, the City asserts that its police and regulatory enforcement opportunities are exempt from the automatic stay under 11 U.S.C. § 362(b)(5).

In Count 2 of the adversary proceeding, plaintiffs seek to declare that the utilization of units for RTU lease arrangements does not convert the building from a R–2 to a R–1 use. Plaintiffs also seek to enjoin the City of Atlantic City from taking any action against the building or the plaintiffs relating to the designation of the building. Because the City may pursue its enforcement activities without the impediment of the automatic stay under 11 U.S.C. § 362(b)(5), debtor's contest with the City of Atlantic City need not be resolved in this forum. The City of Atlantic City may pursue its enforcement action, and the debtor may defend such action, as state law permits. Summary judgment on Count 2 of plaintiffs' complaint is granted in favor of defendants.

### 3. *Estoppel and Waiver.*

█ In the alternative, plaintiffs contend that notwithstanding a restrictive covenant in the Master Deed proscribing commercial activities in the building, repeated and permitted violations of such a covenant constitutes abandonment of the covenant by the project and estops the Association from enforcing the covenant against debtor and the RTU lessees. According to plaintiffs, prior to the commencement of debtor's commercial enterprise, full presentation and disclosure were made to OCCA and unit owners in general of the nature of debtor's business. The principal of the debtor, Gerald Ciccone, showed a promotional film describing debtor's business activities at an open meeting of the Board, which, according to debtor, "was welcomed by the Board and unit owners." It is alleged that newsletters were circulated among unit owners describing debtor's proposed activities. OCCA approved the concept at the Board meeting on April 5, 1987. Plaintiff contends that the absence of protest or objection by OCCA or unit owners in the building to the project induced debtor to invest substantial funds in the project, in reasonable reliance on the continuing approval of the enterprise by the OCCA Board and/or unit owners in the building. Further, the active support by OCCA of an application to the Atlantic City Planning Board for amendment to the building's final site plan approval to provide for transient rental occupancy in the building demonstrates the continued support of OCCA, the Board and unit owners for debtor's business activities.

OCCA responds by challenging debtor's factual contentions, asserting that the OCCA Board never voted to approve the use of OCC units for RTU leasing activities. As well, OCCA contends that active opposition to debtor's business program commenced at the outset of debtor's operations and has continued.

█ On a summary judgment motion under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). On plaintiffs' motion for partial summary judgment against OCCA on the basis of estoppel and/or waiver, the existence of genuine issues of material fact preclude the entry of summary judgment in plaintiffs' favor on these issues.

Defendant OCCA submits that even if the facts are accepted as plaintiffs have presented them, and all inferences to be

drawn from the facts are viewed in a light most favorable to the plaintiffs, plaintiffs would not be entitled to a judgment as a matter of law on the issues of estoppel and waiver. Defendants' argument must be rejected.

Defendant is certainly correct that the provisions of a master deed control on the question of the authority of a condominium association to act. If an association is not authorized to act under a master deed, or has exceeded its authority, its actions may be invalidated.

However, equitable principles of estoppel and waiver have been applied by New Jersey courts to impact upon certain types of deed restrictions. For instance, in the *City of Paterson v. Schneider*, 31 N.J.Super. 598, 107 A.2d 553 (App.Div.1954), a deed restriction forbade the erection of buildings other than one-family dwellings costing $10,000 or more. The City of Paterson and a private developer constructed seven apartment houses on the restricted tract, to accommodate nearly 400 families. Prior to construction, the City gave public notice to the entire community of its intention to violate the restrictive covenants by the construction of public housing. No protest of the City's contemplated conduct was made. When the City brought suit to quiet title to the realty, adjacent land owners whose lots were also encumbered by the restrictive covenants at issue acknowledged actual knowledge of the intended violation prior to any actual violation by the City. As well, defendants admitted that they voiced no objection nor took any action to prevent the violation. Defendants admitted "that their course of conduct in that respect would now bar and estop them from any relief in an affirmative suit seeking the enforcement of the restrictive covenants as against the plaintiffs." *Id.* at 603, 107 A.2d 553. The court noted generally that "[t]here can be no doubt that violations of restrictive covenants can constitute an abandonment of a neighborhood scheme, in whole or in part, and that such conduct may indicate an intent on the part of the property owners to abandon the original plan". *Id.* at 605, 107 A.2d 553. The specific factual scenario in the case was addressed as follows:

"[t]he City gave public notice to the entire community of its intention to so violate said restrictive covenants. The defendants had advance notice of this avowed intent. In spite of such notice, they saw fit to sit supinely by and permit the plaintiff to undertake the obligation to expend millions of dollars without one word of protest or one objection to its contemplated conduct. They thereby impliedly consented to the violation and to the partial abandonment of the restrictive covenant."

*Id.* at 606, 107 A.2d 553.

*See also, Evans v. Rosenberg*, 1 N.J. 590, 65 A.2d 55 (1949) and *La Fetra v. Beveridge*, 124 N.J.Eq. 24, 199 A. 70 (E. & A.1938).

Defendant has presented documentation that objection to the debtor's business operations were verbalized from the outset, that litigation was commenced against the marketing techniques of the debtor at the early stages of his operation, and that the heated debate concerning the continuation of debtor's business activities persisted in the building among unit owners. Defendant has also argued strenuously that any reliance placed by debtor on the actions or inactions of the OCCA Board cannot constitute reasonable reliance, as required under estoppel and waiver concepts. These issues are peculiarly fact-sensitive, and require plenary consideration. Accordingly, defendants' motion for summary judgment on plaintiffs' estoppel and waiver claims is denied.

### 4. *Defendants' Cross–Motion for Summary Judgment on all Counts.*

On Counts 1, 2 and 3 of the plaintiffs' complaint, the only unresolved aspect is plaintiffs' quest for compensatory and punitive damages, counsel fees and costs of suit. Counts 4, 6 and 7 charge the OCCA Board of Trustees with intentional and malicious action against plaintiffs, active conspiracy by the Board to eliminate or impair the rights of the debtor and RTU lessees and actions "calculated to cause the debtor

and the RTU lessees severe economic harm and to interfere with their prospective economic advantage."

 It has been noted that genuine issues of material fact are presented regarding the conduct of all parties throughout the course of the time frame in question. As a general proposition, questions involving intent, malice, conspiracy and the like should not be resolved by summary judgment. *See e.g., Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2nd Cir.1979).

 As to Count 5, wherein plaintiffs allege that the election of the OCCA Board of Trustees held on August 19, 1990, was "improper, in violation of the by-laws of the OCCA and illegal", no evidence is produced by the plaintiffs to support the factual basis for this assertion. A movant is entitled to summary judgment where "there is an absence of evidence to support the non-moving party's case." *Celotex Corporation v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Summary judgment will be granted in favor of defendant OCCA on Count 5 of the complaint.

### CONCLUSIONS

To summarize the conclusions of law entered herein, the following is noted:

1. Partial summary judgment in favor of plaintiffs on Counts 1 and 3 is granted in part. The resolution adopted by the OCCA Board on February 25, 1990, "Amending Policy & Procedure for the Approval of Leases by Adopting Minimum Lease Periods" is invalidated. OCCA is enjoined from placing limitations on the time a unit may be rented, unless the Master Deed is amended by the vote of seventy-five percent (75%) of the unit owners. Any such amendment may have prospective application only.

2. Plaintiffs' motion for partial summary judgment on Counts 1 and 3 is denied, insofar as plaintiffs seek to enjoin OCCA from interfering with or hinder debtor's activities in marketing and selling RTU interests in units at the Ocean Club. Defendant's cross motion for summary judgment on Count 1 and 3 in this regard is granted.

3. Defendant's cross motion on Count 2 of plaintiffs' complaint is granted. The City of Atlantic City may pursue any enforcement action regarding use classification at the Ocean Club.

4. On the issues of estoppel, waiver or latches, summary judgment is denied.

5. Summary judgment is denied as to Counts 4, 6 and 7 of the complaint.

6. Summary judgment on Count 5 of complaint, challenging the election of the OCCA Board in August 1989, is. granted.

Plaintiffs shall submit an order in conformance herewith.